Eunice **MAXAM**, et al., Plaintiffs,

v.

The **LOWER SIOUX INDIAN COMMUNITY OF MINNESOTA**, d/b/a "Jackpot Junction Casino", et al., Defendants.

**Civ. No. 3–92–193.**

United States District Court,
D. Minnesota,
Third Division.

March 11, 1993.

Zenas Baer, Wefald & Baer, Hawley, MN, Bradley R. Janzen, Leif E. Rasmussen, Moriarty & Janzen, Minneapolis, MN, Melvin J. Peterson, Sr., Peterson & Magnussen, Robbinsdale, MN, for plaintiffs.

James Mark Schoessler, Jacobson Buffalo Schoessler & Magnuson, Robert Michael Small, U.S. Atty. Office, Minneapolis, MN, for defendants.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter is before the court upon plaintiffs' motion for a preliminary injunction.

For the reasons stated below, the court grants plaintiffs' motion in part and denies plaintiffs' motion in part.

## BACKGROUND

The Lower Sioux Indian Community of Minnesota (Community) is a federally recognized tribe of American Indians. The Community was organized in 1936, pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461–479. The Community established Jackpot Junction Casino in 1984. The tribal gaming enterprise, authorized by the federal Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, is intended to generate revenue for the benefit of the Community and its members.

Jackpot Junction has prospered in recent years and the Community has been able to distribute a portion of the Casino's profits directly to individual members of the Community by means of "per capita payments." The Community's governing body, the Community Council, has passed a succession of resolutions detailing who is eligible to receive per capita payments. The most recent revised ordinance, apparently enacted in response to claims raised in this litigation, limits eligibility for payments to enrolled members of the Community who either (i) resided on the Lower Sioux Reservation or within a ten-mile radius of the Reservation on August 23, 1990 or (ii) qualify for rights and privileges of membership under Community Resolution 21–93 (enacted shortly before the hearing on the present motion), which requires, *inter alia,* approval by more than 50% of eligible members in a Community referendum.

The plaintiffs are enrolled members of the Community who are not eligible for per capita payments under the resolutions described above. The plaintiffs allege that while 141 enrolled members receive distributions, at least 300 enrolled members of the Community are ineligible for payments under the present rules. The plaintiffs brought this action against the Community, the Community Council and the Secretary of the Interior,

contending that the Community's refusal to make payments to them violates the Community Constitution, the Community Corporate Charter and several federal statutes, including the Indian Reorganization Act, the Indian Civil Rights Act (ICRA) and the Indian Gaming Regulatory Act (IGRA).

In the present motion, plaintiffs seek to enjoin the Community from making further per capita payments pending a determination of the propriety of the present payment system. The IGRA requires that the U.S. Secretary of the Interior approve a tribe's plan for per capita distribution of profits from Indian gaming enterprises. *See* 25 U.S.C. § 2710(b)(3). Plaintiffs contend that because the Secretary of the Interior (Secretary) has not approved the present per capita payment plan, any distribution of gaming profits to individuals violates the IGRA. Plaintiffs further contend that the Secretary cannot approve the plan in its present form because the plan does not comply with other provisions of the IGRA and implementing regulations.[1] Additional facts are discussed below as they become relevant.

## DISCUSSION

### I. MAY PLAINTIFFS MAINTAIN THIS ACTION IN FEDERAL COURT?

#### A. Standing

■ In order to maintain an action in federal court, the plaintiffs must establish that they meet the standing requirements of Article III of the United States Constitution. In order to establish standing, plaintiffs must make a three-part showing: (1) plaintiff must have sustained an injury in fact, i.e. an invasion of a legally protected interest which is concrete, particularized and actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between that injury and the complained-of conduct; and (3) it must be likely—as opposed to merely speculative—that the injury can be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)

---

**1.** At argument, plaintiffs' counsel informed the court that for purposes of the present motion, plaintiffs seek to establish this court's jurisdiction based solely on the Indian Gaming Regulatory Act. Therefore, in considering this motion, the court will not review other claims and jurisdictional bases asserted by the plaintiffs in this matter.

(citations omitted). The court considers each element in turn.

### (1) Injury in Fact

The Lower Sioux Indian Community conducts Class II gaming activities at Jackpot Junction pursuant to authority granted by the Indian Gaming Regulatory Act.[2] The IGRA allows distribution of net revenues from Class II gaming enterprises to tribal members (per capita payments) only under certain conditions:

> Net revenues from any class II gaming activities conducted or licensed by any Indian tribe may be used to make per capita payments to *members of the Indian tribe* only if—
>
> (A) the Indian tribe has prepared a plan to allocate revenues to uses authorized by paragraph (2)(B)[3];
>
> (B) the plan is approved by the Secretary [of the Interior] as adequate, particularly with respect to uses described in clause (i) or (iii) of paragraph (2)(B); ...

25 U.S.C. § 2710(b)(3) (emphasis added) (subsections (C) and (D), dealing with protection of minors and federal taxation of payments, omitted).

The current per capita payment plan, promulgated and implemented by the Community Council, provides payments to only 141 "qualified enrolled members." The plaintiffs are all enrolled members of the Lower Sioux Indian Community who are barred from receiving per capita payments under the present plan. The IGRA provides for per capita payments to members of an Indian tribe generally and without language limiting payments to any class of members. Therefore, the court finds that, at least initially, all enrolled members of a tribe are entitled to receive per capita payments.

2. It is not clear from the record and arguments of the parties whether the Community also conducts Class III gaming at Jackpot Junction. However, this question is of little import because the relevant requirements for Class II gaming are made applicable to Class III gaming by 25 U.S.C. §§ 2710(d)(1)(A)(ii) and 2710(d)(2)(A).

3. 25 U.S.C. § 2710(b)(2)(B) provides:
   (B) net revenues from any tribal gaming are not to be used for purposes other than—

The IGRA appears to provide authority for the Secretary of the Interior to approve a per capita payment plan which excludes certain enrolled members or otherwise does not equally distribute gaming revenues to all tribal members. However, it is undisputed that the Secretary has not affirmatively acted to approve the per capita payment plan enacted by the Community Council. Absent Secretarial approval of a plan limiting payments to a certain class of tribal members, the plaintiffs are entitled to receive per capita payments on the same basis as all other tribal members. *See Ross v. Flandreau Santee Sioux Tribe,* 809 F.Supp. 738 (S.D.S.D.1992) (reaching similar conclusion).

This understanding of the IGRA finds support in guidelines issued by the Office of the Secretary of the Interior to direct the Bureau of Indian Affairs in its review of proposed per capita payment plans:

> When the Revenue Allocation Plan calls for distribution of per capita payments to an identified group of members rather than all members, the tribe shall provide a justification for limiting such payments to the identified group of members. The justification must establish a rational basis for making payments to the identified group of members. The tribe must insure that the distinction between members eligible to receive payments and members ineligible is reasonable and not arbitrary, does not discriminate or otherwise violate the Indian Civil Rights Act. The tribe's justification must comply with the tribe's governing or organic documents.

*Guidelines to Govern the Review and Approval of Per Capita Payments* at 2. (U.S. Dept. of the Interior, December 21, 1992).

> (i) to fund tribal government operations or programs;
> (ii) to provide for the general welfare of the Indian tribe and its members;
> (iii) to promote tribal economic development;
> (iv) to donate to charitable organizations; or
> (v) to help fund operations of local government agencies

The Community's present distribution scheme makes per capita payments to some enrolled members while refusing to make payments to the plaintiffs. The Secretary has not affirmatively approved this distribution to a limited class of tribal members, as required by the IGRA. Thus, plaintiffs have established that their exclusion from per capita distributions constitutes a concrete injury in fact.

### (2) Causal Connection

The Community has made per capita payments to a limited class of its members for several years without obtaining approval from the Secretary as required by the IGRA. Unless ordered to do otherwise, the defendants apparently intend to continue making these payments in violation of the law. As the preceding discussion shows, there is a plain causal connection between the plaintiffs' injury—their exclusion from per capita distributions without the approval of the Secretary, and the conduct complained of—defendants' failure to seek and obtain that approval.

### (3) Redressability

A favorable decision by this court would terminate the disbursement of per capita payments without Secretarial approval. Further, any affirmative decision by the Secretary, whether favorable or unfavorable to the plaintiffs, will bring the Community's distribution scheme into facial compliance with the IGRA. Finally, a decision favorable to the plaintiffs on their claims that their exclusion from per capita payments violates the Indian Civil Rights Act and the Community's governing and organic documents might allow plaintiffs to obtain the underlying relief they are seeking, a revised per capita payment plan which entitles them to receive payments.[4] Plaintiffs have demonstrated that their injury can be redressed by a favorable decision.

Because plaintiffs satisfy the three requirements, they have standing to bring this action. *See Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

### B. Sovereign Immunity

■ Defendants argue that this court has no jurisdiction to hear this matter because the Community and its officials possess sovereign immunity to suit in the federal courts. It is well-established that Indian tribes have immunity to suit in federal court absent congressional abrogation or a clear waiver by the tribe. *See Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978). However, the IGRA, which provides authority for tribes to engage in gaming, makes Indian gaming subject to the conditions and requirements of the Act. Any tribe which elects to reap the benefits of gaming authority created by the IGRA must comply with the Act's requirements. *See Oklahoma Tax Comm'n v. Potawatomi Indian Tribe,* 498 U.S. 505, 512–15, 111 S.Ct. 905, 911–12, 112 L.Ed.2d 1112 (tribal sovereign immunity does not excuse tribes from all legal obligations).

The Community's decision to conduct Class II gaming pursuant to the IGRA constitutes a clear waiver of sovereign immunity for the purpose of enforcement of the requirements imposed as a statutory condition of permission to engage in such activities. Any other understanding of the Act would render the requirements of the IGRA a nullity by allowing Indian tribes to conduct gaming in violation of the Act with impunity. The court must conclude that when an Indian tribe engages in gaming governed by the IGRA, it waives its immunity to suit for the narrow purpose of determining compliance with the requirements of the Act. Therefore, this court has federal question jurisdiction to hear the present motion.

■ Even apart from the Community's waiver, this court likely has jurisdiction to hear the present request for equitable relief. The court's exercise of jurisdiction for pur-

---

4. The court believes it inappropriate at this juncture to comment on the merits of the plaintiffs' underlying substantive challenge to the Community's present per capita payment system, other than to note that plaintiffs' objections to the current plan appear to present a colorable claim and that it is possible that the Secretary could refuse to approve the plan in its present form.

poses of this motion is confined to consideration of a request for injunctive relief. The court does not today consider plaintiffs' separate claims seeking money damages. The Supreme Court in *Potawatomi* held by implication that a tribe's sovereign immunity from actions for money damages "does not necessarily extend to actions seeking equitable relief." *Potawatomi,* 498 U.S. at 516, 111 S.Ct. at 913 (Stevens, J., concurring).

## II. PRELIMINARY INJUNCTION

### A. Standard

The Eighth Circuit has established the following analysis to be used in considering a preliminary injunction motion:

> [W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981); *accord Medtronic, Inc. v. Gibbons,* 527 F.Supp. 1085, 1090 (D.Minn.1981), *aff'd,* 684 F.2d 565 (8th Cir.1982). The movant must establish a threat of irreparable harm before an injunction may be issued. *Dataphase,* 640 F.2d 109, 114 n. 9. However, a court must be flexible in balancing the equities and no single factor should be determinative in that inquiry. *Id.* at 113.

### B. Application of the Dataphase factors

#### 1. Threat of Irreparable Harm

The plaintiffs face a threat of irreparable harm from violations of their civil rights, the possibility that they will be found to be entitled to per capita payments but precluded from seeking those payments by a retroactive payment prohibition, and the uncertain availability of funds to redress a potentially large monetary injury. The court describes each of these threats in turn.

Initially, plaintiffs contend that the community's refusal to include plaintiffs in per capita distributions violates the guarantee of equal protection of the laws contained in the Indian Civil Rights Act (ICRA), 25 U.S.C. § 1302(8). With the exception of habeas corpus actions, federal courts are without jurisdiction to hear private civil actions seeking to enforce the provisions of the ICRA. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). However, as discussed above, the IGRA requires the Secretary to review and approve all per capita payment plans. The IGRA imposes no limits on the Secretary's inquiry into the "adequacy" of the per capita payment plan and the guidelines promulgated by the Secretary prohibit approval of any plan which violates the ICRA:

> The [BIA] Area Director shall not approve any Plan or Ordinance relating to the distribution of net revenues from a gaming activity if: ...
>
> > (3) the tribe has failed to provide a reasonable justification for limiting per capita payments to certain groups of members and violates the Indian Civil Rights Act of 1968 ...

*Guidelines to Govern the Review and Approval of Per Capita Payments* at 4. (U.S. Dept. of the Interior, December 21, 1992).

Interference with the exercise of constitutional rights constitutes irreparable injury. *Planned Parenthood v. Citizens for Com. Action,* 558 F.2d 861, 867 (8th Cir. 1977); *Heritage Pub. Co. v. Fishman,* 634 F.Supp. 1489, 1497 (D.Minn.1986). Although the ICRA is a statute and not a constitution, the rights it is intended to protect are clearly analogous to individual rights protected by several amendments to the United States Constitution. The Supreme Court has suggested that the content of the rights guaranteed by the ICRA may be different than those guaranteed by the U.S. Constitution. *See Martinez* 436 U.S. at 65, 98 S.Ct. at 1680. However, this court has found no case suggesting that the rights guaranteed by the ICRA are any less important or that an Indian government's denial of those rights is any less irreparable than a similar denial of federal constitutional rights by federal, state or local government.

Under the IGRA and the Department of the Interior's implementing guidelines, the Secretary has the authority and responsibility to consider claims of violations of the ICRA in its review of per capita payment plans. If the Community has denied rights guaranteed to the plaintiffs by the ICRA, plaintiffs have suffered irreparable harm. Therefore, the failure of the Community to obtain approval for its per capita payment plan constitutes a threat of irreparable harm to the plaintiffs.

Second, the most recent Community ordinance governing per capita payment eligibility contains a clause prohibiting retroactive payments. *See Gaming Revenue Allocation Ordinance* § 103(F) (Community Res. 22–93, Jan. 29, 1993). The same ordinance contains a "severability" clause, providing that if any part of the ordinance is held invalid, the remainder of the ordinance shall remain in force. *See Gaming Revenue Allocation Ordinance* at § 104. Because of the severability clause, it is possible that the Secretary could find that the per capita eligibility provisions of the ordinance are invalid while allowing the retroactive payment prohibition to stand. In that case, the plaintiffs would have been harmed by an improper per capita distribution system, but be barred from seeking a retrospective remedy for that harm. Therefore, the current per capita payment eligibility ordinance, in combination with the plaintiffs' circumstances, demonstrate another threat of irreparable harm to the plaintiffs.

Finally, the Community made per capita distributions to approximately 141 adults and 125 children in 1990, 1991 and 1992. Those distributions totalled approximately $740,000 or $4300 per adult recipient in 1990; $6,433,-000 or $37,000 per adult recipient in 1991; and 5,727,000 or $33,000 per adult recipient in 1992.[5] During the same period, approximately 300 adult enrolled members of the Community received no per capita payments. If the plaintiffs are found to be entitled to per capita payments, their monetary injury would be substantial.

The per capita payments are, by definition, drawn from net revenues from the Community's gaming operations. The casino business is a risky enterprise. Like other entertainment industries, the success and profitability of casinos depends heavily on the disposable income of potential customers, which varies with the cycles of the economy. Some other Indian-owned casinos in the region are experiencing serious financial difficulty. Further, the court takes judicial notice that recent events and studies suggest Minnesota is near or at the saturation point in legal gambling enterprises. At the same time, bills to legalize certain forms of gambling in non-Indian establishments are currently pending before the Minnesota Legislature. These factors suggest that the size of the future revenue stream from the Community's gaming operations is far from certain.

The defendants have not suggested they have established a reserve fund or other mechanism to accrue funds for any potential liability for per capita payments to the plaintiffs and others similarly situated. Because of the uncertainty of future revenues and the apparent lack of a contingency fund, it is possible that plaintiffs could be found to have been improperly denied per capita payments but be unable to obtain compensation for that injury due to inadequate casino revenues. Effectively, the plaintiffs would have suffered irreparable injury. For all these reasons, the Community's distribution of per capita payments without approval of the Secretary poses a threat of irreparable harm to the plaintiffs.

### 2. *Probability of Success on the Merits*

■ Defendants do not dispute that the Secretary has not affirmatively approved their per capita payment plan. The IGRA requires Secretarial approval of plans for per capita distribution of gaming revenues. *See* 25 U.S.C. § 2710(b)(3)(B). The plaintiffs have demonstrated a very strong likelihood of success on their claim that the current per capita payment plan violates the IGRA because it lacks approval of the Secretary.

---

**5.** These data are approximations compiled by the plaintiffs. Defendants have not submitted actual numbers, but they have not contested the accuracy of the plaintiffs' calculations.

In addition, plaintiffs may succeed in convincing the Secretary that the current distribution plan violates the ICRA and the Community Constitution. The guidelines established by the Secretary for review of per capita payment plans require that the plans comply with the ICRA and the Community's governing or organic documents. *See Guidelines to Govern the Review and Approval of Per Capita Payments* at 2, 4. The plaintiffs have alleged that the Community Council has improperly denied per capita payments to them and to others similarly situated. For example, they allege that the current payment plan denies benefits to 47 enrolled members of the Lower Sioux Community who live within the defined boundaries of the Community. Plaintiffs argue this violates the Community Constitution and the ICRA. According to the Secretary's guidelines, the Council must establish some rational basis for making payments to an identified group of members, rather than all members. *Id.* at 2. Particularly with regard to enrolled members residing within the defined boundaries of the reservation, it is not clear that the defendants have a rational basis for refusing per capita payments.[6] Therefore, plaintiffs have adequately demonstrated likelihood of success on the merits.

### 3. *Balance of the Harms*

■ The harm to the plaintiffs of denying an injunction outweighs the harm to the defendants and others of granting the injunction. If the injunction is denied, the plaintiffs, enrolled members of the Community, will continue to be denied per capita payments entirely. Defendants have given no indication that they intend to pay benefits to the plaintiffs or take strong steps to ensure that the existing distribution system conforms to the law, without some compulsion

from this court. The effect of a refusal to grant injunctive relief would be to indefinitely deny to plaintiffs the substantial payments to which they may be entitled or even a determination of whether they are entitled to such payments.

The harm to defendants of granting the relief sought by plaintiffs—injunction of all per capita payments until this matter is finally resolved—would also be substantial. Members currently receiving per capita payments presumably have included the payments in their financial planning and probably rely on the payments to meet their current financial obligations. Injunction of all per capita payments during the pendency of this matter seems too harsh a penalty to impose on the rank and file members of the Community who currently receive such payments.

However, plaintiffs are entitled to a prompt resolution of this matter and determination of their entitlement to per capita payments. It appears no such resolution will be forthcoming without an equitable order from this court. The balance of harms thus weighs in favor of the plaintiffs, but the court will consider the harm to the defendants in fashioning its remedy.

### 4. *Public Interest*

■ The public interest does not weigh heavily in favor of either side. However, to the extent the public interest is implicated, it weighs in favor of the plaintiffs. There is an important public interest in implementing the intent of Congress, the elected representatives of the people in our democratic system. Further, there is a public interest in fostering respect for the law and compliance with the laws of our country. The defendants, by failing to comply with the letter of the law embodied in the Indian Gaming Regulatory Act, offend those public interests. Therefore, the public interest reinforces the plaintiffs' claim for injunctive relief.

---

6. The determination of whether defendants have established a rational basis for limiting payments to a defined group is a decision which must be made by the Secretary. This court may not have jurisdiction to make that determination and does not intend to make that determination here.

Rather the court merely concludes, for the limited purpose of consideration of plaintiffs' motion for a preliminary injunction, that plaintiffs have some likelihood of success on the merits of their claims that the Secretary should reject the current per capita payment plan.

## III. CONCLUSION

Plaintiffs have standing to bring this action in federal court. By engaging in gaming regulated by the IGRA, the Lower Sioux Community has waived its immunity to suits seeking to enforce the requirements of the statute. Thus, this court has jurisdiction to hear this. motion for an injunction to enforce the IGRA. Plaintiffs have adequately demonstrated that the balance of the equities favors their claim for injunctive relief.

Accordingly, IT IS HEREBY **ORDERED** THAT:

1. Defendants Lower Sioux Indian Community and the Lower Sioux Community Council, or their managers or agents, shall pay thirty percent (30%) of any and all per capita payments derived from the net revenues of Class II and Class III gaming at Jackpot Junction Casino, to the Clerk of Court of the United States District Court for the District of Minnesota until such time as a per capita payment plan has been approved by the United States Secretary of the Interior, pursuant to 25 U.S.C. § 2710(b)(3);

2. The Clerk of Court is directed to deposit those funds in an interest-bearing account. In determining where to deposit these monies, the Clerk shall seek an account providing maximum liquidity. The Clerk shall receive proceeds equalling ten percent (10%) of the total interest earned on said account, as an administration fee;

3. In his review of the Lower Sioux Indian Community's per capita payment plan, the United States Secretary of the Interior shall consider the interests, arguments and any supporting submissions of the plaintiffs.