Linda **HOLGUIN**, as Next Friend of Jaji Rubio, a Minor, Individually and as Next of Kin to Rosa Sifuentes, Deceased, Appellant,

v.

**YSLETA DEL SUR PUEBLO, Appellee.**

No. 08–96–00124–CV.

Court of Appeals of Texas, El Paso.

Aug. 28, 1997.

Rehearings Overruled Nov. 19, 1997.

Woodrow W. Bean, II, El Paso, for appellant.

Kurt Paxson, Steven L. Hughes, Mounce, Green, Myers, Safi & Galatzan, El Paso, for appellee.

Before LARSEN, McCLURE and CHEW, JJ.

## OPINION

McCLURE, Justice.

In this case, we address a question unaddressed by any Texas appellate court or, for that matter, by another court in the United States: whether the immunity enjoyed by federally recognized Indian tribes serves to bar a private suit brought pursuant to a state dram shop act by the survivors of a person who became intoxicated at a tribal casino and was subsequently killed in an off-reservation automobile accident. We answer in the affirmative, and conclude that:

● the State of Texas created the Texas Dram Shop Act (the Act) pursuant to its police power to regulate the use of alcohol;

● under 18 U.S.C. § 1161 and *Rice v. Rehner*, 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983), the decision of the Ysleta del Sur Pueblo to sell alcohol at a tribal casino subjects the Tribe to the Act;

● tribal sovereign immunity cannot bar the State of Texas from enforcing the provisions of the Texas Alcoholic Beverage Code (the Code) against the Tribe, including the imposition of penalties for non-compliance with the Act; but

● despite the public policy function served by private dram shop suits, tribal sovereign immunity protects the Tribe from private suits for personal injuries resulting from non-compliance with the Act.

## SUMMARY OF THE EVIDENCE

For purposes of evaluating the summary judgment granted by the trial court, we take as true all factual allegations contained in Appellant's complaint. On or about August 26, 1994, Rosa Sifuentes entered the casino of the Ysleta Del Sur Pueblo, also known as the Tigua Indian Reservation. While in the casino, she drank alcoholic beverages served by employees who continued to serve her alcohol past the point at which she became obviously intoxicated. After Sifuentes left the casino, she lost control of her car and collided head-on with another vehicle on Alameda Avenue, which borders the reservation to the north. Sifuentes died of injuries resulting from the accident. Appellant brought suit, alleging wrongful death and survival, negligence, gross negligence, premises liability, and civil liability under the Texas Dram Shop Act.

The Tribe filed a motion for summary judgment, requesting that the court take judicial notice of its status as a federally recognized Indian tribe, as reflected in 25 U.S.C. § 1300g[the Ysleta Del Sur Restoration Act]. It argued that it was immune from Appellant's civil suit for personal injuries, and that only an explicit waiver of immunity by Congress would make it amenable to suit or liability.

Appellant responded by urging that federal law did not immunize Indian tribes from the exercise of police power by the states to regulate the traffic of liquor and to ensure public safety, especially in cases involving non-Indians. Appellant also requested a continuance of the summary judgment hearing in order to conduct further discovery. The trial court denied the continuance, grant-

ed summary judgment, and severed Appellant's claims against a co-defendant.

On appeal, Appellant raises seven points of error. In points one through six, she alleges that the trial court erred in granting summary judgment based on tribal immunity. In the seventh, she contends that the trial court erred in failing to grant the continuance. We affirm.

## STANDARD OF REVIEW

■ On summary judgment, a movant/defendant must as a matter of law either (1) conclusively negate one or more of the elements of the plaintiff's cause of action; or (2) establish a complete affirmative defense as a matter of law. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex.1987). Unlike other final judgments reviewed on appeal, we do not review the evidence in the light most favorable to the judgment of the trial court. *Continental Savings Association v. Collins*, 814 S.W.2d 829, 831–32 (Tex.App.—Houston [14th Dist.] 1991, no writ). As explained in *Nixon v. Mr. Property Management Co., Inc.*, 690 S.W.2d 546, 548–49 (Tex.1985), (1) the movant for summary judgment has the burden of showing there is no genuine issue of material fact and that it is entitled to summary judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue precluding summary judgment, all admissible evidence favorable to the non-movant will be taken as true; (3) every reasonable inference must be indulged in favor of the non-movant and all doubts resolved in the non-movant's favor.

The Texas Supreme Court has determined that the Legislature intended to include the intoxicated person who causes the accident among those who may sue under the Act. *Smith v. Sewell*, 858 S.W.2d 350 (Tex.1993). Appellant's first points of error therefore require us to determine whether the tribal sovereign immunity enjoyed by the Ysleta Del Sur Pueblo as a federally recognized Indian tribe protects the Tribe from suit and liability under the Texas Dram Shop Act, TEX.ALCO.BEV.CODE ANN. §§ 2.01–2.03 (Vernon 1995).

## TRIBAL SOVEREIGN IMMUNITY

### Tribal Immunity in General

■ Indian tribes have long enjoyed the status of "domestic dependent nations." *Cherokee Nation v. State of Georgia*, 30 U.S. (5 Pet.) 1, 8, 8 L.Ed. 25 (1831). Absent clear congressional and/or tribal waiver, common law principles of sovereign immunity apply to Indian tribes. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58–59, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106, 113–14 (1978).

■ One specific attribute of tribal sovereignty consists of immunity from suit in state courts. *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112, 1120–21 (1991). In *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), the United States Supreme Court ruled that state laws were permitted to intrude only where essential tribal relations were not involved. In the absence of specific acts of Congress, states could not infringe on the right of reservation Indians to make their own laws and be ruled by them. *Williams*, 358 U.S. at 220, 79 S.Ct. at 270–71. In *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), the Supreme Court specified that states could only pass or enforce laws applying to Indian tribes that did not interfere with tribal self-government and that involved non-Indians. *McClanahan* refocused the approach away from "inherent Indian sovereignty" and toward evaluating the "applicable treaties and statutes which define the limits of state power" in order to determine if state regulation is preempted by federal law. *McClanahan*, 411 U.S. at 172, 93 S.Ct. at 1262.

■ As defined by *McClanahan* and its progeny, the basic assumptions with respect to tribal sovereignty are that (1) Indian tribes inherently possess the authority to govern their internal affairs; (2) states cannot interfere with tribal self-government; and (3) Congress possesses plenary power to limit the sovereignty of Indian tribes. After *McClanahan*, Indian tribes are presumed to have authority, but the scope of the tribes' inherent power to govern their internal af-

fairs is defined by Congress. The states, in turn, have power over areas of regulation that Congress has taken away from the tribes but not placed under federal control. The power of a state to exercise control over an aspect of tribal affairs therefore ranks third behind the tribe itself and the federal government. The contrast between this general approach to tribal sovereign immunity and the approach adopted when alcohol regulation is at issue will become important to our analysis of the Texas Dram Shop Act.

## The Ysleta Del Sur Pueblo

The Ysleta Del Sur Pueblo enjoys the status of a federally recognized tribe under 25 U.S.C. § 1300g–1–7, passed in 1987, and therefore enjoys tribal sovereign immunity. The Tribe consented in 25 U.S.C. § 1300g–4(f) to the civil and criminal jurisdiction of the State of Texas according to the terms of Public Law 280, codified as 25 U.S.C. § 1321 and § 1322. The grant of civil jurisdiction found in Public Law 280 is found in 25 U.S.C. § 1322(a):

> The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any and all such civil causes of action arising within such Indian country or any part thereof as may be determined by such State that has jurisdiction over other civil causes of action; and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.

The United States Supreme Court has held that Public Law 280 and its amendments, entitled the Indian Civil Rights Act of 1968, do not constitute a waiver of tribal immunity. *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering*, 476 U.S. 877, 892, 106 S.Ct. 2305, 2314, 90 L.Ed.2d 881, 894–95 (1986). Public Law 280 was intended to create civil and criminal jurisdiction for the resolution of private disputes between individual Indians or between Indians and non-Indians, not to create jurisdiction over the tribes themselves. *Bryan v. Itasca County, Minnesota*, 426 U.S. 373, 383–384, 96 S.Ct. 2102, 2108–09, 48 L.Ed.2d 710, 718 (1976). Suits brought against Indian tribes pursuant to the terms of Public Law 280 are barred by tribal immunity absent a legislative pronouncement to the contrary. *Santa Clara Pueblo*, 436 U.S. at 59, 98 S.Ct. at 1677, 56 L.Ed.2d at 115–16.

Against this backdrop of tribal immunity, the Tribe contends that no court in the United States has ever held that a federally recognized Indian tribe's immunity was waived so as to create liability in a personal injury lawsuit brought by a private plaintiff. It points to several decisions from state courts in which plaintiffs attempted to bring suit against a federally recognized tribe for injuries sustained either on the reservation itself or while patronizing a business run by the tribe in question. In each of these cases, the courts have determined that the tribes were not amenable to suit brought by private plaintiffs for personal injury or death. *See DeFeo v. Ski Apache Resort*, 120 N.M. 640, 904 P.2d 1065 (N.M.App.1995, cert.denied)(Mescalero Apache reservation held immune from suit in state court for personal injuries sustained by non-Indian guest at Mescalero-run ski resort); *Tibbetts v. Leech Lake Reservation Business Committee*, 397 N.W.2d 883 (Minn.1986)(Chippewa Tribe held immune from suit brought by tribal member in state court under Minnesota workers' compensation statute); *Graves v. White Mountain Apache Tribe of the Fort Apache Indian Reservation*, 117 Ariz. 32, 570 P.2d 803 (App. Div. 1, 1977, review denied), *cert denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978)(White Mountain Apache tribe held immune from suit brought by plaintiff electrocuted while loading wood chips at tribal sawmill); and *Cohen v. Little Six, Inc.*, 543 N.W.2d 376 (Minn.App.1996, review granted)(business corporation organized and run to manage casino under tribal law by Shakopee Mdewankanton Sioux tribe held immune from suit brought by non-Indi-

an casino patron to recover for personal injuries suffered from broken chair). The Tribe contends that this case presents precisely the same situation: a private plaintiff suing an Indian tribe in tort for damages as a result of personal injuries or death resulting from negligence, either on a reservation or at a tribal business. It dismisses as inapplicable all federal authority cited by Appellant concerning the federal waiver of immunity for state regulation of alcohol, alleging that a suit for personal injuries brought under the Texas Dram Shop Act is indistinguishable from a common law tort action or statutory wrongful death action for purposes of evaluating tribal immunity. The Tribe points out that the State of Texas is not a party to the suit, and neither licensing [1] nor taxation is at issue.

We agree with the Tribe that the precedent rejecting personal injury suits brought against Indian tribes on the basis of tribal immunity is consistent. We note, however, that none of the personal injury cases involved state dram shop laws, which are created pursuant to a state's police power to regulate alcohol. We therefore cannot conclude without further analysis that conventional personal injury cases are dispositive. We must address the difficult question of whether a statutory cause of action created for personal damages resulting from the illegal distribution of alcohol fits within the waiver of tribal immunity established for state regulation of alcohol.

### Waiver of Immunity for Alcohol Regulation by the States

In *Rice v. Rehner*, 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983), the United States Supreme Court interpreted the meaning of 18 U.S.C. § 1161, which provides that the federal prohibitions against alcohol on Indian reservations shall not apply

to any act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which the act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such

area of Indian country, certified by the Secretary of the Interior, and published in the Federal Register.

Although *Rehner* involved the issue of whether an individual tribe member who traded alcohol on a California reservation could be required to submit to California state licensing requirements, the Supreme Court considered not just the imposition of such requirements on individual tribal members, but on the tribes themselves. *Rehner*, 463 U.S. at 721, 103 S.Ct. at 3297. The Court determined that 18 U.S.C. § 1161, coupled with the absence of tribal interest in alcohol regulation and a strong state interest in alcohol regulation, preempted Indian tribes from asserting an interest in alcohol.

### *Absence of Tribal Interest*

The Supreme Court noted initially that despite the presumption of tribal immunity, Congress has to a significant degree opened the doors of the reservation to the application of state laws. The Court declared that the deference afforded to tribal immunity depends on the regulatory area in question. If there exists a strong tradition of tribal interest in self-determination in the subject of state regulation, then the Court will not infer that state laws apply, absent an explicit waiver from Congress. On the other hand, if no such tradition of tribal interest in self-determination exists for the regulatory area in question—and especially if the balance of federal, tribal, and state interests points to the necessity of state regulation—then the Court affords far less weight to the "backdrop" of tribal immunity for that specific regulatory area. *Rehner*, 463 U.S. at 719–20, 103 S.Ct. at 3296.

With respect to the regulation of alcohol, the Court found almost no tradition whatsoever of tribal interest in self-determination. In fact, the Court observed that Indian tribes solicited federal intervention in the regulation of liquor in Indian territory beginning in the nineteenth century; liquor regulation is seen as the first area of regulation that was removed from tribal sovereignty. As for the

---

1. Indeed, the record does not even reflect whether the Texas Alcoholic Beverage Commission

(TABC) has issued a liquor license to the Pueblo or the casino.

sale of alcohol, the Court found no "congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development." Further, the Court determined that the tribe lacked "the usual accoutrements of tribal self-government," and that because the activity in which the tribe sought to engage (the sale of alcohol to non-Indians) had a potentially substantial impact beyond the reservation, the Court could "accord little if any weight to any asserted interest in tribal sovereignty in this case." 463 U.S. at 724–25, 103 S.Ct. at 3299. Indeed, "[t]here can be no doubt that Congress has divested the Indians of any inherent power to regulate in this area." *Rehner*, 463 U.S. at 724, 103 S.Ct. at 3298.

### Strong State Interest

By contrast, the Court determined that the states' interest in regulating alcohol on reservations was especially strong. Congress normally assumes that the states have no power to regulate the affairs of Indians on a reservation, but this assumption "would be unwarranted in the narrow context of the regulation of liquor." *Rehner*, 463 U.S. at 723, 103 S.Ct. at 3298. The Court concluded that "[t]he State has an unquestionable interest in the liquor traffic that occurs within its borders, and this interest is independent of the authority conferred on the States by the Twenty-first Amendment." *Rehner*, 463 U.S. at 724, 103 S.Ct. at 3298, *citing Crowley v. Christensen*, 137 U.S. 86, 91, 11 S.Ct. 13, 15, 34 L.Ed. 620 (1890). That liquor sold on the reservation could find its way into non-tribal hands has "spillover" effects on state citizens. This creates an acute state interest in regulating liquor on the reservation. To deny the state authority to regulate the distribution and use of alcohol on reservations would create an entire alcohol distribution network over which the state had no control. "A State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate state intervention." *Rehner*, 463 U.S. at 724, 103 S.Ct. at 3298, *citing New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 336, 103 S.Ct. 2378, 2387, 76 L.Ed.2d 611 (1983).

In its discussion of the legislative intent underlying 18 U.S.C. § 1161, the Supreme Court explained that Congress "intended that state laws would apply of their own force to govern tribal liquor transactions as long as the tribe itself approved these transactions by enacting an ordinance." *Rehner*, 463 U.S. at 726, 103 S.Ct. at 3299. The statute shifted the question of prohibition on the reservations to the tribal governments, rather than the state governments. The tribes could vote to remain dry, or they could vote to approve liquor transactions on the reservations. If the tribes approved on-reservation liquor transactions, state laws regulating the use and distribution of liquor would apply. *Rehner*, 463 U.S. at 725–28, 103 S.Ct. at 3299–3300.

The Supreme Court determined that no explicit waiver of immunity was necessary for specific instances of state alcohol laws to conclude that Congress had allowed for state regulation of the use and distribution of alcohol. "[B]ecause of the lack of a tradition of self-government in the area of liquor regulation, it is not necessary that Congress indicate expressly that the State has jurisdiction to regulate the licensing and distribution of alcohol." *Rehner*, 463 U.S. at 731, 103 S.Ct. at 3302. The Court described the Congressional decision embodied in 18 U.S.C. § 1161 as protecting the State's police power over liquor transactions within its borders. *Rehner*, 463 U.S. at 731, 103 S.Ct. at 3302.

### Power of Enforcement

In order to fully understand the significance of the Supreme Court's holding in *Rehner*, it is necessary to review the construction of 18 U.S.C. § 1161 that the Court rejected. In *Rehner v. Rice*, 678 F.2d 1340 (9th Cir.), *cert. granted*, 459 U.S. 966, 103 S.Ct. 291, 74 L.Ed.2d 275 (1982), *rev'd*, 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961, *remand*, 717 F.2d 492, *reh. denied*, 464 U.S. 874, 104 S.Ct. 209, 78 L.Ed.2d 185 (1983), the Ninth Circuit held that if a tribe's sale of alcohol failed to comply with state laws, the tribe was subject to federal laws prohibiting the buying or selling of alcohol on reservations. Non-compliance with state law simply served as a triggering device to invoke federal jurisdiction under

the statutes forbidding alcohol trade. Under this construction, it was impossible for the states to enforce their alcohol laws when tribes failed to comply, because 18 U.S.C. § 1161 contained no waiver of tribal sovereign immunity with respect to the states that would overcome federal preemption.

The Supreme Court rejected this interpretation. "Our examination of § 1161 leads us to conclude that Congress authorized, rather than pre-empted, state regulation over Indian liquor transactions." *Rehner*, 463 U.S. at 726, 103 S.Ct. at 3299. By holding that the statute waived tribal sovereign immunity with respect to the states' regulation of alcohol, the Court intended in part to answer the question whether states could *enforce* their laws regulating the distribution and use of alcohol when Indian tribes violated the laws in transactions involving non-Indians. *Rehner* repudiated the theory that 18 U.S.C. § 1161 confers the "right" of alcohol regulation on the states without conferring the "remedy" of enforcement. The decision is unique because it reverses the usual approach to preemption analysis. Normally, one asks whether *states* are preempted by federal or tribal law from asserting a regulatory interest. With respect to alcohol policy, the Supreme Court has concluded that *Indian tribes* are preempted from asserting a regulatory interest. It is difficult to imagine a stronger expression of the states' control over alcohol policy, or a stronger expression of the waiver of tribal immunity.

Decisions relying on *Rehner* have confirmed the interest of states in enforcing state laws that regulate and tax alcohol on Indian reservations. In *Fort Belknap Indian Community v. Mazurek*, 43 F.3d 428, 432–35, (9th Cir.1994), the Ninth Circuit addressed criminal prosecutions by the State of Montana for violations of state liquor laws on Indian reservations. The federal appellate court agreed with the Montana Supreme Court that in the "narrow context" of alcohol regulation, enforcement through criminal prosecution was necessary to effectuate the intent of Congress. The Court acknowledged that state criminal prosecutions based on activities occurring on the reservation would constitute a "significant infringement on tribal self-government." *Fort Belknap Indian Community*, 43 F.3d at 434. However, absent criminal enforcement, the state would be powerless to effectuate its alcohol laws. *Fort Belknap Indian Community*, 43 F.3d at 434. In *Squaxin Island Tribe v. State of Washington*, 781 F.2d 715 (9th Cir. 1986), four federally recognized Indian tribes in the State of Washington requested declaratory and injunctive relief from state liquor regulations that required tribal retail liquor stores to submit to .vendor agreements with the state as a precondition to selling alcohol to non-Indians. The agreements required prepayment of the cost of the liquor upon delivery, payment of state liquor taxes, restriction of advertising, state control of the location of tribal liquor stores, and other restrictions. The tribes had passed their own ordinances pursuant to 18 U.S.C. § 1161 and sued to enjoin the state from enforcing its regulations. Following an unfavorable ruling from the trial court that upheld the state's authority to regulate tribal liquor transactions with nonIndians, the tribes appealed. The Ninth Circuit held that the extensive regulations adopted by the state could be enforced under the Supreme Court's reasoning in *Rehner*, and found that even a state alcohol tax that significantly impairs a tribe's revenues and its ability to sustain itself and its programs, could not be invalidated for creating an economic burden alone. *Squaxin Island Tribe*, 781 F.2d at 719–20.

### *Limits on Powers of Enforcement*

The waiver of tribal immunity for the enforcement of alcohol-related laws becomes more problematic, however, when states attempt to collect money damages for tribal noncompliance. In the same decision that upheld extensive state alcohol regulations, the Ninth Circuit held that no waiver of tribal sovereign immunity existed for the state to collect unpaid back taxes from the tribes. *Squaxin Island Tribe*, 781 F.2d at 722–24. Other federal decisions have found that no waiver existed for the collection of unpaid taxes and penalties by state governments, whether with respect to alcohol or other goods sold on reservations, such as cigarettes. *State of Oklahoma ex rel. Oklahoma Tax Comm'n v. Graham*, 822 F.2d 951

(10th Cir.1987); *Chemehuevi Indian Tribe v. California State Board of Equalization*, 757 F.2d 1047 (9th Cir.), *rev'd on other grounds*, 474 U.S. 9, 106 S.Ct. 289, 88 L.Ed.2d 9 (1985). These decisions appear to conflict with the holding of *Rehner* that tribal sovereign immunity cannot prevent state governments from enforcing their alcohol laws on Indian reservations, especially given that *Rehner* found that the tribes were preempted from asserting an interest in alcohol regulation. With respect to the enforcement of alcohol-related laws, however, federal courts currently distinguish between equitable relief, for which immunity is waived, and relief in the form of money damages, for which immunity has not been waived.

We pause to note that the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721 (1988 & Supp.1993), creates a limited waiver of immunity for the regulation of gaming, but is silent as to any waiver of immunity with respect to alcohol served incident to gaming activities on Indian reservations. Even within the context of gaming on reservations, the Indian Gaming Regulatory Act waives tribal sovereign immunity as to regulations incident to gaming, but does not create a private cause of action for money damages. *Maxam v. Lower Sioux Indian Community of Minnesota*, 829 F.Supp. 277, 281–82 (D.Minn. 1993).

### The Texas Dram Shop Act

In order to determine the nature of the Act for purposes of ascertaining whether tribal immunity bars private suits, we must examine the text of the statute. The Texas Alcoholic Beverage Code is "an exercise of the police power of the state for the protection of the welfare, health, peace, temperance, and safety of the people of the state," and "shall be liberally construed to accomplish this purpose." Tex.Alco.Bev.Code Ann. § 1.03. The Texas Dram Shop Act, Tex. Alco.Bev.Code Ann. §§ 2.01–2.03, provides as follows:

#### § 2.01. Definitions

In this chapter:

(1) 'Provider' means a person who sells or serves an alcoholic beverage under authority of a license or permit issued under the terms of this code or who otherwise sells an alcoholic beverage to an individual.

(2) 'Provision' includes, but is not limited to, the sale or service of an alcoholic beverage.

#### § 2.02. Causes of Action

(a) This chapter does not affect the right of any person to bring a common law cause of action against any individual whose consumption of an alcoholic beverage allegedly resulted in causing the person bringing the suit to suffer personal injury or property damage.

(b) Providing, selling, or serving an alcoholic beverage may be made the basis of a statutory cause of action under this chapter and may be made the basis of a revocation proceeding under Section 6.01(b) of this code upon proof that:

(1) at the time the provision occurred it was apparent to the provider that the individual being sold, served, or provided with an alcoholic beverage was obviously intoxicated to the extent that he presented a clear danger to himself and others; and

(2) the intoxication of the recipient of the alcoholic beverage was a proximate cause of the damages suffered.

#### § 2.03. Statutory Remedy

The liability of providers under this chapter for the actions of their customers, members, or guests who are or become intoxicated is in lieu of common law or other statutory law warranties and duties of providers of alcoholic beverages. This chapter does not impose obligations on a provider of alcoholic beverages other than those expressly stated in this chapter. This chapter provides the exclusive cause of action for providing an alcoholic beverage to a person 18 years of age or older.

Section 2.02(b) establishes that the Texas Alcoholic Beverage Commission (TABC) can hold proceedings to revoke an alcohol license or permit by establishing the identical two elements necessary for a private plaintiff to establish liability under the Act: (1) at the time the recipient was being served or sold alcohol it was apparent that the recipient was intoxicated; and (2) the recipient's intoxi-

cation was a proximate cause of the subsequent injuries. The TABC derives its authority to revoke a license or permit by demonstrating these elements pursuant to Tex.Alco.Bev.Code Ann. § 6.01(b):

§ 6.01. Rights and Privileges; Revocation

(b) A license or permit issued under this code is a purely personal privilege and is subject to revocation or suspension if the holder is found to have violated a provision of this code or a rule of the commission.

Because the elements necessary to revoke a liquor license or permit are the same as the elements necessary for a private plaintiff to establish dram shop liability, private plaintiffs under the Texas Dram Shop Act serve a "private attorneys general" function. A condition for maintaining one's permit or license to serve alcohol is enforced, not only by possible revocation proceedings by the TABC, but also by the specter of private liability under the Act.

The intimate connection between the public policy objectives of the Code and the Act becomes apparent upon examination of Tex. Alco.Bev.Code Ann. § 106.14, which provides an affirmative defense for employers whose employees serve alcoholic beverages to minors or to obviously intoxicated persons. This statute provides that an employer will not be held responsible for the actions of its employee if (1) the employer requires all employees to undergo a training program approved by the TABC; (2) the employee who served a minor or intoxicated person actually attended the program; and (3) the employer has not directly or indirectly encouraged the employee to violate the law. The Code therefore uses potential liability under the Act as an incentive for employers to instigate training programs devised by the TABC. See I–Gotcha, Inc. v. McInnis, 903 S.W.2d 829, 837–38 (Tex.App.—Fort Worth 1995, writ denied)(use of Section 106.14 with respect to serving minors); see also, Pena v. Neal, Inc., 901 S.W.2d 663, 667 (Tex.App.—San Antonio 1995, writ denied)(use of Section 106.14 with respect to intoxicated persons).

The case law that has construed the Act since its passage in 1987 demonstrates that this law exists to further the public policy interest declared in Section 1.03 of the Code. Texas courts have consistently emphasized: (1) that the dram shop law exists to prevent commercial providers from serving or selling alcohol to intoxicated persons, who then drive automobiles and injure or kill others; (2) that such a remedy did not exist at common law, and is in derogation of the common law; and (3) that Texas courts respect the Act as the exclusive remedy for the public policy concern it addresses.

At common law, an establishment that provided alcohol to someone who then caused injury was not held liable because the provision of alcohol could not be considered the proximate cause of injuries; the actions of the person who voluntarily became intoxicated were considered the proximate cause. Smith, 858 S.W.2d at 352. State legislatures have created dram shop laws, in derogation of these common law principles, as a policy mechanism to reduce the dangers that result from serving or selling alcohol to intoxicated persons. Texas courts have recognized that a dram shop law is necessary to deter the disastrous consequences of providing alcohol to drivers who then injure or kill others. In El Chico Corp., 732 S.W.2d at 311, the Texas Supreme Court sought to fashion a common law remedy approximating a statutory dram shop law in the same year that the Texas Legislature passed the statute now in effect. El Chico Corp. cited statistics from 1985 indicating that 30,794 traffic accidents resulted from drunk driving in Texas in one year, accidents in which 989 people were killed and 25,461 people were injured. Based on these statistics, the Court commented that the foreseeable likelihood of causing injury by serving alcohol to an obviously intoxicated person was as great as one would expect from releasing a rattlesnake in a shopping mall. El Chico Corp., 732 S.W.2d at 311. Subsequent to the El Chico Corp. decision, courts have affirmed that the dram shop law exists in order to deter the disastrous public policy consequences that result from serving alcohol to obviously intoxicated persons. See for example, Smith, 858 S.W.2d at 352–53 (statute's plain requirements must be satisfied and will not be applied to cases not clearly within its purview).

Texas courts have refused to broaden the application of the Act beyond the boundaries clearly enunciated in the statute. For example, courts have refused to fashion judicial remedies, even where apparent contradictions exist between the text of the dram shop law and other provisions of the Alcoholic Beverage Code.[2] The courts have also refused to extend liability to social hosts serving alcohol to guests in a non-commercial setting. *See Graff v. Beard,* 858 S.W.2d 918 (Tex.1993). *See also, Smith v. Merritt,* 940 S.W.2d 602 (Tex.1997)(Texas Dram Shop Act precludes causes of action for negligence or negligence per se for serving alcohol to 19–year–old by social host). The courts have acknowledged that the Act was created by statute in derogation of common law principles to regulate commercial providers of alcohol, and, as such, courts should defer to the plain meaning of the text of the law rather than using the dram shop law to fashion judicially created remedies. *See for example, Graff,* 858 S.W.2d at 919; *Smith,* 858 S.W.2d at 354–55.

### *Dram Shop Act as Legitimate Function of the Police Power*

■ Under their police power, and distinct from the Twenty–First Amendment, the states possess the power to regulate the distribution and use of liquor within their borders, or to prohibit it altogether. *Rehner,* 463 U.S. at 726, 103 S.Ct. at 3299; *Crowley v. Christensen,* 137 U.S. 86, 91, 11 S.Ct. 13, 15, 34 L.Ed. 620 (1890). In *Crowley,* Justice Field described the public policy concerns that justified the regulation of dram shops, and noted that in order to minimize the "crime and misery attributable to the use of ardent spirits," the states had a longstanding tradition of exercising their police power in the form of alcohol regulations. *Crowley,* 137 U.S. at 91, 11 S.Ct. at 15, 34 L.Ed. at 623. In one of only two decisions by the United States Supreme Court that have addressed the constitutionality of state dram shop statutes, the Court upheld the validity of an Illinois law as an exercise of the police power that did not violate the Fourteenth Amendment, finding that the law protected the state's citizens from evil consequences of the distribution and use of alcohol. In *Eiger v. Garrity,* 246 U.S. 97, 38 S.Ct. 298, 62 L.Ed. 596 (1918), the Court considered a Fourteenth Amendment takings challenge brought by a dram shop owner to an ancestor of the modern dram shop statute. The Illinois Legislature passed a law declaring that every husband, wife, child, parent, guardian, employer, or other person who was injured by an intoxicated person had the right to sue the dram shop owner who served the alcoholic beverages to the intoxicated person; the statute provided that the aggrieved person, if successful, could obtain a lien on the real property of the dram shop owner. In establishing the validity of the statute, the Court characterized the dram shop law as one of many passed under the legitimate police power of the state to regulate the traffic in intoxicating liquors and to prevent their evil consequences. *Eiger,* 246 U.S. at 102–03, 38 S.Ct. at 300.

As we have already discussed, the Supreme Court held in *Rehner* that the regulation of alcohol on Indian reservations by state governments constitutes a legitimate exercise of the police power for which tribal sovereign immunity has been waived. In *Eiger,* the Court categorized a state's creation of a private cause of action against a dram shop owner as a legitimate exercise of the police power to regulate alcohol. Indeed, Tex.Alco.Bev.Code Ann. § 1.03 declares that the public policy of the Alcoholic Beverage Code consists of exercising the police power of the state for the protection of the welfare, health, peace, temperance, and safety of the people of the state.

2. Section 106.03(a) declares that for purposes of the Alcoholic Beverage Code, a minor shall be considered a person under 21 years of age, whereas a minor for other purposes under Texas law is a person under the age of 18. The dram shop law, however, declares that its provisions will constitute the exclusive remedy for the provision of alcohol to persons 18 years of age or older. Rather than invalidating the apparent contradiction, Texas courts have deferred to the Legislature, finding that it was within the prerogative of the lawmakers to distinguish 18, 19, and 20–year–olds from other minors for purposes of the dram shop law. *See Fuller v. Maxus Energy Corporation,* 841 S.W.2d 881, 884–85 (Tex.App.—Waco 1992, no writ); *Boyd v. Fuel Distributors, Inc.,* 795 S.W.2d 266, 273 (Tex.App.—Austin 1990, writ denied).

 In accordance with the United States Supreme Court in *Eiger v. Garrity*, we hold that a statutory dram shop law that confers standing upon private individuals to sue for damages caused by violations of the state's alcoholic beverage code falls within the exercise of the state's police power. As such, a dram shop law falls within the waiver of tribal immunity created by Congress and the federal courts for the regulation of alcohol by the states. The holder of a license or permit from the TABC assumes the duties imposed by the Texas Alcoholic Beverage Code by accepting the license or permit. The Legislature empowered the TABC to enforce the Texas Dram Shop Act by revoking permits or licenses under TEX. ALCO.BEV.CODE ANN. § 6.01. We conclude that the Ysleta Del Sur Pueblo is subject to alcohol licensure and permitting requirements, to the Texas Dram Shop Act, and to enforcement of the Texas Dram Shop Act by license and permit revocation by the TABC.

### Private Cause of Action

 We cannot conclude, however, that tribal sovereign immunity is waived for a *private suit* brought under the Texas Dram Shop Act. Although private dram shop plaintiffs clearly create incentives that further the public policy objectives of the Texas Alcoholic Beverages Code, private plaintiffs do not and cannot exercise the actual police power of the state. The police power of the state cannot be delegated to private persons. 16A C.J.S. *Constitutional Law* § 435 (1984). Although *Eiger* characterized a state dram shop law as a legitimate alcohol regulation created pursuant to police power, it did not address whether a specific suit, brought by a private plaintiff, fell under the auspices of the state's police power to regulate alcohol. *See Barshop v. Medina County Underground Water Conservation District*, 925 S.W.2d 618, 625–27, 630–31 (Tex.1996). We today decide that a private cause of action created by the Texas Dram Shop Act does not constitute "enforcement" of an alcohol-related law that falls within the waiver of tribal immunity.

Even if it were possible to construe a private suit under the Act as an enforcement action by the state, we could not conclude that tribal sovereign immunity would be waived because federal courts have not resolved whether actions for money damages brought to enforce alcohol-related laws fall within the waiver of immunity described by the United States Supreme Court in *Rice v. Rehner*. Several federal courts have refused to find a waiver of tribal sovereign immunity to exist for suits brought by various states to collect money damages for unpaid liquor taxes from Indian tribes. *See for example, Squaxin Island Tribe*, 781 F.2d at 715; *State of Oklahoma ex rel. Oklahoma Tax Common*, 822 F.2d at 951; *Chemehuevi Indian Tribe*, 757 F.2d at 1047, *rev'd on other grounds*, 474 U.S. 9, 106 S.Ct. 289, 88 L.Ed.2d 9 (1985). Points of Error Nos. One through Six are overruled.

### INADEQUATE OPPORTUNITY FOR DISCOVERY

In her seventh point of error, Appellant alleges that the trial court erred by refusing to grant a motion for continuance to conduct further discovery prior to ruling on Appellee's motion for summary judgment.

 In *Levinthal v. Kelsey–Seybold Clinic*, 902 S.W.2d 508, 510 (Tex.App.—Houston [1st Dist.] 1994, writ denied), the following factors were used to determine whether the trial court had abused its discretion in refusing to grant a motion for continuance to conduct further discovery: (1) the length of time the case was on file; (2) the materiality of the discovery sought; and (3) whether due diligence was used in obtaining the discovery. We conclude that the second factor outlined in *Levinthal* is dispositive in the present case. Further discovery would not have been material to the legal issue on which the trial court granted summary judgment; the inability of a private plaintiff under the Texas Dram Shop Act to bring suit for money damages against a federally recognized Indian tribe. Appellant's seventh point of error is overruled. The summary judgment is affirmed.