## INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, LODGE NO. 1777, Plaintiff–Appellant,

v.

## FANSTEEL, INC., Defendant–Appellee.

### No. 89–1682.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 26, 1989.

Decided April 16, 1990.

---

John F. Ward, William A. Widmer, III, Carmell, Charone, Widmer, Mathews & Moss, Chicago, Ill., for plaintiff-appellant.

William F. Mahoney, Segal, McCambridge, Singer & Mahoney, Chicago, Ill., Eric Hemmendinger, Stephen Shawe, Shawe & Rosenthal, Baltimore, Md., for defendant-appellee.

Before CUMMINGS, COFFEY and MANION, Circuit Judges.

COFFEY, Circuit Judge.

International Association of Machinists and Aerospace Workers, Lodge No. 1777 (hereinafter Union) appeals from a summary judgment entered in favor of Fansteel, Inc., vacating sections of an arbitration award on the ground of non-arbitrability. 708 F.Supp. 891 N.D.Ill.1989. We affirm.

## I.

Fansteel and the Union were parties to a collective bargaining agreement expiring May 31, 1987, that covered approximately 80 Fansteel employees at Fansteel's North Chicago plant. The Union and Fansteel were unable to reach an agreement during negotiations for a new contract that took place prior to the former contract's expiration date. As a result of the parties' failure to negotiate a new agreement, the Union went out on strike on June 1, 1987. In response to the Union's strike Fansteel hired 39 permanent replacements, 31 of whom were assigned to Fansteel's entry level classifications.

During the final stages of the strike Fansteel and the Union negotiated over the conditions under which the strikers might return to work. The parties agreed to the following language as part of a strike settlement agreement:

"The strike against Fansteel, Inc. by the Company's employees who are members of one of the Unions is terminated as of the date of this Agreement. Striking employees shall be returned to work to openings in the classifications occupied by the employee on May 31, 1987, in accordance with their respective seniority, and the recall provisions of the Collective Bargaining Agreement(s) shall determine the order of return to work."

In addition to the above agreed upon language, Fansteel proposed that the Strike Settlement Agreement contain the follow-

ing two sections (paragraphs 2 and 3), to which the Union objected:

"2. Jobs filled by employees hired by the Company on or after June 1, 1987 as replacements for striking employees (new hires) shall not be considered vacancies to which returning strikers shall be returned unless and until such jobs are vacated by the strike replacements. Such new hires shall not be bumped or displaced by the return of strikers. Such newly hired employees shall become members of the Union(s) as stated in the Collective Bargaining Agreement and their respective seniority shall be measured from their individual hire date.

3. A newly-hired employee shall not be 'displaced' or 'bumped' as a result of an employee returning to work after an illness or injury leave of absence (industrial or non-occupational). The returning employee may exercise his/her seniority affecting other employees other than those newly hired and otherwise in conformance with the Collective Bargaining Agreement(s)."

Because the parties did not agree to Fansteel's proposal concerning these two paragraphs, the parties determined that while paragraphs 2 and 3 would physically remain in the printed Agreement, the following marginal notation would be added reflecting the parties' failure to agree to these provisions. This marginal note read:

"Items 2 and 3 represent the position of the Company and are not agreed to by the Union or waived by the Company."

The parties also agreed to add a new unnumbered paragraph that read:

"The rights as stated in Items 2 and 3, if any, of the persons put to work after the start of the strike will be determined by mutual agreement of the parties, or the NLRB or an agency or a court of competent jurisdiction subject to all rights of appeal and all applicable rules and regulations of the NLRB or such agencies or courts."

The parties also agreed to other provisions in the strike settlement agreement that were relevant to disputes concerning this agreement:

"14. The Company and the Unions agree that neither of them shall take any action against an employee because he participated in or failed to participate in the strike. Any action by the Union or any employee taken before the NLRB or court concerning the persons put to work after the start of the strike is not prohibited by this item 14.

15. Any dispute arising in the implementation of this Agreement may be referred to the Grievance Procedure of the new Collective Bargaining Agreement or to other appropriate Governmental Agencies."

On July 11, 1987, the parties entered into a strike settlement agreement that contained the terms previously enumerated and also agreed upon a new collective bargaining agreement. On July 15, 1987, thirty of the strikers returned to work.[1] On that same day the Union filed a grievance under the parties' collective bargaining agreement that stated:

"The Company is using new hires (probationary) and salaried personnel to keep it's (sic) Union and senior employees from returning to work.

This is a violation of the current Collective Bargaining Agreement, and in particular, articals (sic) 16–6–10– & 22 as well as the letters on pages 111–112–113–118– & 119.

We demand that any employees affected by this violation be compensated for losses suffered."

On July 21, 1987, the Union and Fansteel met concerning the above grievance. On July 28, 1987, Fansteel responded to the Union's position that the company was violating the Collective Bargaining Agreement in using replacements ("new hires") with

---

1. On July 13, 1987, between the settlement of the strike and the return of many of the strikers to work, the Union filed an unfair labor practice charge with the National Labor Relations Board. This charge was dismissed on August 28, 1987 and the Union's appeal of this dismissal to the Board's General Counsel was rejected on April 14, 1988.

the following announcement: [2]

"The Company will classify the 'new hires' in the job classification appropriate for the work 'new hires' were hired to do and have been performing. This classification will be effective as of the hire date of each of the 'new hires,' respectively."

Fansteel then upgraded all the replacements in Labor Grade 8 to the next higher grade in each department (either Labor Grade 6 or 5), without following the contractual procedures of job posting and bidding.

The Union requested arbitration on August 4, 1987, and on April 15, 1988, an arbitration hearing was held. At the outset of the arbitration hearing, Fansteel noted its objection to the arbitrability of the grievance. While declaring that Fansteel was willing to proceed with the arbitration, subject to its arbitrability objection, Fansteel's attorney stated:

"To the extent this grievance arises concerning the implementation of the strike settlement agreement, it is clearly arbitrable. However, to the extent that the union is seeking in its grievance the reinstatement of the strikers who were replaced by permanent replacements during the strike, such relief is clearly not authorized by the collective bargaining agreement or strike settlement agreement which expressly recites the parties failure to reach agreement on reinstatement and which expressly provides for a forum to decide that issue, which would be the National Labor Relations Board and not arbitration.

Therefore, any award of the relief that the union appears to be seeking in this case would be beyond the scope of the collective bargaining agreement and would not be legal and to that extent we believe that what the union is seeking is not authorized by the collective bargaining agreement.

We are willing to let the arbitrator make that determination in the first instance. However, we want to make it clear that we are in no way submitting to the arbitrator the question of the lawfulness of the union's [sic] hiring permanent replacements, which is an issue for the National Labor Relations Board."

Fansteel and the Union then proceeded with the arbitration hearing. The arbitrator's award initially determined that Fansteel's decision to proceed with the arbitration hearing did not waive its arbitrability objection. However, the arbitrator also determined that the issues the Union had submitted to arbitration (violation of the collective bargaining agreement in permitting the new hires to work after the strike in positions reserved for higher classifications, violation of the collective bargaining agreement or the strike settlement agreement in the retroactive re-classification of the replacement employees, and the appropriate remedy) were all arbitrable.[3] The arbitrator went on to hold that Fansteel violated the collective bargaining agreement because the new hires were performing work outside of their job classification and Fansteel's retroactive reclassification of the replacements violated the collective bargaining agreement. As the remedy for Fansteel's violations, the arbitrator ordered Fansteel to post for bidding all job positions into which Fansteel had upgraded the replacements and to make whole for lost earnings any employees entitled to these positions.

## II.

Initially the Union argues that Fansteel waived its arbitrability objection and consented to the arbitration of the Union's grievance when Fansteel agreed to participate in the arbitration hearing.

In *Jones Dairy Farm v. Local No. P– 1236, United Food and Commercial*

2. The Union argued that Fansteel was violating the contract in utilizing replacements classified as Labor Grade 8 to do work that Labor Grade 8 employees could not perform under the terms of the collective bargaining agreement.

3. The arbitrator also determined that the question of whether the collective bargaining agreement prohibits supervisors from working in employee positions was arbitrable. This determination is not part of this case because Fansteel has not sought to have this aspect of the decision vacated.

*Workers International Union*, 760 F.2d 173, 175, 176 (7th Cir.1985), we held that "[i]f a party voluntarily and unreservedly submits an issue to arbitration, he cannot later argue that the arbitrator had no authority to resolve it.... By going forward with the arbitration without questioning the arbitrator's authority to resolve the dispute, [the company] consented to have [the arbitrator] decide what legal rights in the contracting-out clause meant." However, in the *Jones Dairy Farm* case, we contrasted that situation with a case where a party at the arbitration hearing explicitly reserved its challenge to arbitrability: "[The company] did not, while agreeing to participate in the arbitration, challenge the arbitrator's jurisdiction, and make clear that it was preserving its challenge for eventual presentation to a court if the arbitrator ruled in the union's favor, as in *Wilkes–Barre Publishing Co. v. Newspaper Guild of Wilkes–Barre, Local 120*, 647 F.2d 372, 382 (3rd Cir.1981). The company never questioned the arbitrator's authority." *Jones Dairy Farm*, 760 F.2d at 175 (citation omitted). Unlike the factual scenario in *Jones Dairy Farm*, Fansteel explicitly reserved its objection to arbitrability when it participated in the arbitration hearing, while stating that matters involving the "reclassification of the strikers who were replaced during the strike" were to be decided by "the National Labor Relations Board and not arbitration."

■ We are thus presented with the question of whether a party who has attempted to preserve its objections to arbitrability nonetheless waives these objections if it participates in an arbitration hearing. Fansteel carefully and explicitly, in unambiguous language, made known to the arbitrator and the union its clear intention that it was maintaining its objections to arbitrability even though it was agreeing to proceed with the arbitration hearing. The Union has not stated that it raised objections during the arbitration hearing to Fansteel's reservation of its right to challenge arbitrability. Fansteel's explicit reservation of rights complies with our language in *Jones Dairy Farm* and in our opinion allows the Company to participate

in an arbitration hearing and reserves the Company's right to challenge the arbitrator's authority in a subsequent court proceeding. Furthermore, this approach conforms with both case law, *see, e.g., Wilkes–Barre Publishing Co. v. Newspaper Guild of Wilkes–Barre, Local 120*, 647 F.2d 372, 382 (3rd Cir.1981); *Northwest Airlines, Inc. v. International Association of Machinists and Aerospace Workers, Air Transport District Lodge No. 143*, 1988 WL134701, 1988 U.S. Dist. LEXIS 14198, at 11–13 (D.Minn.1988); *R.W. Granger & Sons, Inc. v. Eastern Massachusetts Carpenters and Carpenters Local 275 of the United Brotherhood of Carpenters*, 686 F.Supp. 22, 25–26 (D.Mass.1988) (cases permitting party to challenge arbitrability in court after proceeding with an arbitration hearing), and the views of commentators in the area of labor arbitration. *See* Elkouri & Elkouri, *How Arbitration Works* 220–21 (4th ed. 1985); Fairweather, *Practice and Procedure in Labor Arbitration* 132 (2d ed. 1983).

Fansteel's right to challenge arbitrability in court following its participation in an arbitration hearing is not only supported in the legal precedent, it also reflects wise public policy. In permitting an arbitrator to attempt to address a dispute prior to a judicial arbitrability determination, parties may well be able to resolve their disputes without requiring the involvement of the judiciary. Furthermore, our upholding of the process does not discriminate in favor of the party who submits to arbitration of a grievance that it did not initiate subject to a later judicial arbitrability challenge. The party initiating arbitration has made a decision that the dispute is arbitrable when it initiates an arbitration proceeding. If that party felt the dispute was not arbitrable it would have chosen a forum other than arbitration. Thus, permission for the non-initiating party to preserve arbitrability objections following the arbitration hearing merely permits the non-initiating party to make the same decision concerning arbitrability that the initiating party made prior to submission of the decision to arbitrate and does not discriminate against the initiating

party. Indeed, such a rule frequently is beneficial to the party who initiated arbitration in allowing that party access to the arbitral process without the necessity of the filing of a lawsuit to compel arbitration.

We are convinced that both precedent and public policy support a rule that permits a party to proceed with an arbitration hearing subject to the right to later challenge the grievance's arbitrability in a judicial forum. Thus, we conclude that Fansteel did not waive its right to contest arbitrability in a judicial forum when it agreed to proceed with the arbitration hearing subject to its arbitrability objections.

### III.

■ We now turn to the question of whether the Union's grievance is arbitrable. "[T]he question of arbitrability— whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agree to arbitrate is to be decided by the court, not the arbitrator." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). Thus, where one party has clearly preserved the question of arbitrability for judicial determination, and there is no agreement that the arbitrator resolve the issue of arbitrability, we are called upon to make an independent determination of the arbitrability question. While we note that the arbitrator attempted to decide the arbitrability question, the resolution of this question is our responsibility and we will approach this issue *de novo* without deference to the arbitrator's decision.

The Supreme Court has also recognized that:

"It has been established that where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assur-

ance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.' [*Steel Workers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 [80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409] (1960) ]. Such a presumption is particularly applicable where the clause is as broad as the one employed in this case, which provides for arbitration of 'any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder....' In such cases '[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.' *Warrior & Gulf, supra*, 363 U.S., at 584–585 [80 S.Ct. at 1353–1354]."

*AT & T Technologies, Inc.*, 475 U.S. at 650, 106 S.Ct. at 1419 (citation omitted).

■ In resolving an arbitrability issue the first step in determining coverage under the arbitration clause is to ascertain whether the present dispute falls within the scope of the arbitration clause. The language in the parties' collective bargaining agreement containing the broad arbitration clause allows for the arbitration of any differences "as to the meaning and application of any of the provisions of this Agreement" or over "any other matter relating to rates of pay, wages, hours or other conditions of employment affecting the employees of the Company." Furthermore, the parties' strike settlement agreement provided as a general matter that "[a]ny dispute arising in the implementation of this Agreement may be referred to the Grievance Procedure of the new Collective Bargaining Agreement or to other appropriate Governmental Agencies." Since the union's grievance alleged contractual violations as a result of the replacement employees' work outside regular job classifications and reclassification, on its face the grievance would appear to fall within the arbitration clause's coverage.

Even when the arbitration clause facially applies to the present dispute, that does not

end our inquiry. If we can say with positive assurance that the parties intended to exclude the involved dispute from arbitration, then no obligation to arbitrate will exist. In concluding their strike settlement agreement, the parties were unable to reach an accord with respect to the issue of whether permanent replacements or strikers should be entitled to the positions that permanent replacements occupied during the strike. However, the parties entered into a provision of the strike settlement agreement that stated that "mutual agreement of the parties, or the NLRB, or an agency or a court of competent jurisdiction subject to all rights of appeal and all applicable rules and regulations of the NLRB or such agencies or courts," were to be the methods for determination of the issue of whether permanent replacements had "vacated" positions, thus permitting the return of strikers to these positions. Conspicuously absent from this list of appropriate fora for the resolution of this issue was contractual grievance arbitration.

A reading of the Union's grievance reveals that it was an attempt to resolve in the forum of contractual grievance arbitration the question of whether strikers were entitled to positions occupied by permanent replacements, an issue that the parties had agreed to have resolved in the NLRB and the courts. The grievance was filed on the first day that some strikers returned to work, a timing demonstrating its purpose of securing the return of additional strikers who would supplant the replacement employees. Even more significantly, the language of the grievance itself stated that: "The Company is using new hires (probationary) and salaried personnel to keep its Union and senior employees from returning to work." Thus, the very language of the grievance illustrated the Union's purpose of attempting to displace permanent replacements with striking employees. Finally, the arbitrator ordered that positions held by allegedly misclassified permanent replacement employees be given to more senior striking employees under the Collec-

tive Bargaining Agreement. In our view, this grievance clearly turns upon the question of the rights of permanent replacements and non-reinstated strikers to positions assigned to the permanent replacements during the strike. The parties explicitly reserved and provided that disputes of this nature be heard before the NLRB and the courts rather than in grievance arbitration. Thus, there exists the " 'forceful evidence of a purpose to exclude the claim from arbitration' " [4] that meets the well accepted standard for classifying the grievance as non-arbitrable.

The Union argues that our decision is contrary to the Ninth Circuit's refusal in *Winery Workers Union, Local 186 v. E & J Gallo Winery, Inc.*, 857 F.2d 1353, 1357 (9th Cir.1988), to " 'give effect to poorly drafted exclusionary clauses.' " (Quoting *Johnston–Tombigbee Mfg. Co. v. Local 2462*, 596 F.2d 126, 129 (5th Cir.1979)). Unlike *Gallo*, where the parties' bargaining history did not contain " 'forceful evidence of a purpose to exclude the claim [at issue] from arbitration,' " [5] as we have thoroughly demonstrated above, the bargaining history in this case clearly reveals that the parties agreed to exclude from arbitration issues involving the rights of permanent replacements and non-reinstated strikers to positions assigned to the permanent replacements during the strike.

The Union also argues that our holding, in effect, improperly grants the replacements "super seniority" permanently immunizing them from the operation of seniority and bumping under the parties' collective bargaining agreement. We disagree. The strike settlement agreement specifically and in unambiguous language manifests the parties' clear intent to exempt from arbitration the question of whether a striker's return to work will displace a permanent replacement employee. As long as a striking employee has been recalled to the active work force, his seniority and bumping rights will operate to give the returning employee the benefit of his seniority rights in any dispute with a

**4.** *AT & T Technologies, Inc.*, 475 U.S. at 650, 106 S.Ct. at 1419 (quoting *Steel Workers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584–85, 80 S.Ct. 1347, 1353–54, 4 L.Ed.2d 1409 (1960)).

**5.** *Id.*

replacement employee. *Compare Trans World Airlines v. Independent Federation of Flight Attendants*, 489 U.S. 426, 109 S.Ct. 1225, 1231, 103 L.Ed.2d 456 (1989) ("[O]nce reinstated, the seniority of full-term strikers is in no way affected by their decision to strike."). Only when the grievance is an attempt to secure the return to work of striking employees will it be considered non-arbitrable. We trust that the courts, the party litigants and arbitrators will be able to distinguish between these two situations.

Because the Union's grievance represents an attempt to displace permanent replacement employees with striking employees, a matter that the parties have explicitly reserved for the determination of agencies, such as the National Labor Relations Board, or courts rather than grievance arbitrators, we agree with the finding of the district court that the grievance was non-arbitrable and its decision is

AFFIRMED.