1998 SD 107

James CALVELLO, Plaintiff and Appellant,

v.

YANKTON SIOUX TRIBE, Defendant and Appellee.

No. 20209.

Supreme Court of South Dakota.

Considered on Briefs March 25, 1998.

Reassigned May 11, 1998.

Decided Sept. 9, 1998.

A. Russell Janklow, Sioux Falls, for plaintiff and appellant.

James G. Abourezk of Abourezk Law Offices, Sioux Falls, for defendant and appellee.

KONENKAMP, Justice (on reassignment).

[¶ 1.] Today we must decide whether, in a contract dispute with one of its employees, an Indian Tribe waived its sovereign immunity in state court either by participating in arbitration or by virtue of its Tribal–State Gaming Compact. After the Tribe fired its gaming casino's general manager, the Tribal Chairman agreed to arbitrate the manager's claims, but because the Tribe's governing body had never consented to arbitrate, the Tribe repudiated the arbitrator's ruling. Following an unsuccessful attempt to enforce the award in federal court, the general manager brought suit in state court asserting claims similar to those heard by the arbitrator. Because we find no explicit waiver of sovereign immunity, we affirm the circuit court's grant of summary judgment for the Tribe.

**Facts**

[¶ 2.] The Yankton Sioux Tribe owns the Fort Randall Casino, located on tribal trust land near Pickstown, South Dakota. James Calvello operated the Casino for Gambler's Supply Company, a management firm hired by the Tribe. When the Tribe bought out the remainder of its contract term with Gambler's Supply, it directly hired Calvello as general manager on August 2, 1992. By oral agreement with the Tribe's Business and Claims Committee, Calvello's salary was set at $50,000 per year, together with benefits and reimbursements for business expenses.

[¶ 3.] The governing body for the Yankton Sioux is the General Council, consisting of all adult tribal members. Although the Tribe's nine-member Business and Claims Committee is authorized by the tribal constitution to negotiate agreements, only the General Council is empowered to approve them. Yankton Sioux Tribe's Amended Constitution and By–Laws, Art. IV, § 2. The Tribe's General Council, during its August 28, 1992 meeting, accepted the oral agreement with Calvello, and, in addition, voted to pay him six percent of the Casino's net profits. Until his termination, the Tribe avows that Calvello was paid according to these terms.

[¶ 4.] On November 24, 1992, Calvello and then Tribal Chairman, Steven Cournoyer, Jr., completed negotiations and signed an employment contract.[1] By its terms, it was made retroactive to August 2, 1992. This contract, however, was never approved by the General Council. At an emergency meeting on November 30, 1992, the General Council, after considerable debate, ultimately voted to fire Calvello. Pursuant to the terms of the unapproved contract of November 24th, Calvello sought arbitration claiming the Tribe owed him unpaid salary, expenses, and a percentage of profits.[2] Chairman Cournoyer agreed to arbitrate and, without the General Council's knowledge or consent, instructed the Tribe's attorney to participate. A

---

1. Steven Cournoyer, Jr., Tribal Chairman, was defeated in his bid for reelection in September 1993, but was reelected as Tribal Chairman in the tribal elections of September 1997.

2. The arbitration provision stated:
 Any differences, claims, or matters in dispute arising between the Employer and Employee out of or connected with this agreement shall first be submitted by them to arbitration by the American Arbitration Association or its successor and the determination of the American Arbitration Association or its successor shall be final and absolute. The arbitrator shall be governed by the then existing promulgated rules and regulations of the American Arbitration Association or its successor, and the pertinent provisions of law, relating to arbitration. The decision of the arbitrator may be entered as a judgment only in federal court. It is agreed that only a single arbitrator will be utilized.

hearing was held on September 24, 1993. Three days later, the General Council learned of the arbitration, and immediately passed a unanimous resolution stating that the tribal attorney was not authorized "to arbitrate anything" with Calvello. Minutes, General Council Meeting of September 27, 1993.

[¶ 5.] On January 7, 1994, the arbitrator issued his ruling, declaring that the Tribe had terminated Calvello's employment without good cause, but that the written employment contract was void and its terms unenforceable because the General Council had not approved it. Nonetheless, based on quantum meruit, the arbitrator concluded that Calvello was entitled to an award equal to what the General Council agreed to pay him at its August 28, 1992 meeting. The arbitrator awarded $140,664, including $76,547 for Calvello's share of net profits, $59,117 in lost compensation, and $5,000 reimbursement for the down payment on a house Calvello had made at the direction of the Tribe.

[¶ 6.] As required by the arbitration clause in the employment agreement and the Federal Arbitration Act, 9 U.S.C. §§ 1–16, Calvello applied to federal district court for confirmation and enforcement of the arbitrator's award. The Tribe moved to dismiss on the ground of sovereign immunity. Holding that the Arbitration Act, standing alone, is insufficient to confer jurisdiction, the court dismissed the case for lack of federal subject matter jurisdiction. See Calvello v. Yankton Sioux Tribe, 899 F.Supp. 431 (D.S.D.1995), appeal dismissed, 89 F.3d 840 (8th Cir.1996).

[¶ 7.] Calvello then sued the Tribe in circuit court seeking recompense based on quantum meruit, fraudulent inducement to arbitrate, and fraudulent inducement to contract. The court granted the Tribe's motion for summary judgment, holding that the suit was barred by sovereign immunity, and that, as a matter of law, it was not waived. Calvello appeals, asserting first, that the Tribe waived immunity by participating in arbitration, and second, that the Tribe's Gaming Compact with South Dakota waived sovereign immunity.

### Standard of Review

[¶ 8.] "Under our familiar standard for reviewing summary judgments, we decide only whether genuine issues of material fact existed and whether the law was correctly applied." Kobbeman v. Oleson, 1998 SD 20, ¶ 4, 574 N.W.2d 633, 635. In making such analysis, "the evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party." Lamp v. First Nat'l Bank of Garretson, 496 N.W.2d 581, 583 (S.D.1993) (citations omitted). The burden of proof rests on the movant to clearly show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. State Dep't of Revenue v. Thiewes, 448 N.W.2d 1, 2 (S.D.1989). If there exists no genuine issue of fact, then summary judgment will be affirmed if the trial court correctly decided the legal issues. Alverson v. Northwestern Nat'l Cas. Co., 1997 SD 9, ¶ 4, 559 N.W.2d 234, 235; Meyer v. Santema, 1997 SD 21, ¶ 8, 559 N.W.2d 251, 254. Contract interpretation is a question of law reviewed de novo. State Farm Mut. Auto. Ins. Co. v. Vostad, 520 N.W.2d 273, 275 (S.D. 1994). Jurisdictional challenges are, likewise, reviewable de novo. Bruggeman v. South Dakota Chem. Dep. Counselor Cert. Bd., 1997 SD 132, ¶ 6, 571 N.W.2d 851, 852; Red Fox v. Hettich, 494 N.W.2d 638, 642 (S.D.1993). Lastly, we also review de novo whether an Indian tribe waived its sovereign immunity. See Rosebud Sioux Tribe v. Val–U Constr. Co., 50 F.3d 560, 562 (8thCir.1995), cert. denied, 516 U.S. 819, 116 S.Ct. 78, 133 L.Ed.2d 37 (1995) [hereinafter Val–U Constr. Co.].

### Analysis and Decision

#### 1. Tribal Sovereign Immunity

[¶ 9.] The United States Supreme Court recently held, "Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation." Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc., 523 U.S. ——, ——, 118 S.Ct. 1700, 1705, 140 L.Ed.2d 981 (1998). A tribe's immunity is not waived simply because it agrees to a binding contract. Sac and Fox Nation v.

*Hanson,* 47 F.3d 1061, 1063 (10th Cir.1995) (waiver of tribal sovereign immunity cannot be implied from a tribe's engagement in commercial activity), *cert. denied,* 516 U.S. 810, 116 S.Ct. 57, 133 L.Ed.2d 21 (1995); *American Indian Agric. Credit Consortium, Inc., v. Standing Rock Sioux Tribe,* 780 F.2d 1374, 1378–79 (8th Cir.1985) (tribe's sovereign immunity cannot be waived by implication in contract actions). *See generally Ramey Constr. Co., Inc. v. Apache Tribe of Mescalero Reservation,* 673 F.2d 315 (10th Cir.1982). "Absent an effective waiver or consent, it is settled that a state court may not exercise jurisdiction over a recognized Indian tribe." *Puyallup Tribe, Inc. v. Washington Game Dep't,* 433 U.S. 165, 172, 97 S.Ct. 2616, 2621, 53 L.Ed.2d 667 (1977).

■ [¶ 10.] "Indian tribes are 'distinct, independent political communities, retaining their original natural rights' in matters of local self-government." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 55, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978) (citations omitted); *see also Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 138 n. 5, 102 S.Ct. 894, 902 n. 5, 71 L.Ed.2d 21 (1982); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143–44, 100 S.Ct. 2578, 2583–84, 65 L.Ed.2d 665 (1980). In deference to the unique aspects of tribal sovereignty, "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo,* 436 U.S. at 58, 98 S.Ct. at 1677, 56 L.Ed.2d 106 (citations omitted); *see also Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 14, 107 S.Ct. 971, 975, 94 L.Ed.2d 10 (1987). Only Congress has plenary authority to limit, modify, or eliminate a tribe's sovereign immunity. *Santa Clara Pueblo,* 436 U.S. at 56, 98 S.Ct. at 1676, 56 L.Ed.2d 106 (citations omitted); *see* U.S. Const. art. 1, § 8, cl. 3. The exercise of such authority must be clearly expressed and should be strictly construed. *See generally United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976) (citations omitted).

### 2. Tribe's Participation in Arbitration

■ [¶ 11.] Calvello relies on the Tribe's supposed acquiescence or participation in the arbitration proceeding as a waiver of its sovereign immunity. This reliance directly counters the strong presumption against such waivers. A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *Santa Clara Pueblo,* 436 U.S. at 58, 98 S.Ct. at 1677, 56 L.Ed.2d 106 (citations omitted); *see also Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering,* 476 U.S. 877, 890, 106 S.Ct. 2305, 2313, 90 L.Ed.2d 881 (1986); *Rosebud Sioux Tribe v. A & P Steel, Inc.,* 874 F.2d 550, 552 (8th Cir.1989); *American Indian Agric.,* 780 F.2d at 1378–79 (tribe's sovereign immunity cannot be waived by implication in contract actions); *Cohen v. Little Six, Inc.,* 543 N.W.2d 376, 379 (Minn.Ct.App.1996), *aff'd* 561 N.W.2d 889 (Minn.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2059, 141 L.Ed.2d 137 (1998); F. Cohen, *Handbook of Federal Indian Law* 324 (2d ed 1982).

■ [¶ 12.] The Tribal Chairman ordered the Tribe's attorney and accountant to participate in the arbitration. The General Council, however, the Tribe's decision-making body, took no part in, and, in fact, did not learn of the arbitration hearing until September 27, 1993, three days after it occurred. Based on a second hand assertion from his own answers to interrogatories, Calvello insists that the General Council did authorize participation in arbitration. He submits no direct proof in the form of a tribal resolution, an affidavit, or otherwise. *See Home Fed. Sav. & Loan Ass'n v. First Nat'l Bank,* 405 N.W.2d 655 (S.D.1987) (conclusory assertions insufficient); SDCL 15–6–56(e) (affidavits must be made on personal knowledge setting forth facts admissible in evidence). Without a clear expression of waiver by the Tribe's General Council either before or after the arbitration proceeding, the involvement or purported acquiescence of certain tribal officials cannot waive the Tribe's sovereign immunity. *See Wichita and Affiliated Tribes of Oklahoma v. Hodel,* 788 F.2d 765, 772 (D.C.Cir.1986) (citing *United States v. United States Fidelity & Guar. Co.,* 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940)); *Dillon v. Yankton Sioux Tribe Hous. Auth.,* 144 F.3d 581 (8th Cir.1998) ("sue and be sued" provision in tribal resolution insufficient waiver

absent express contract to waive); *cf. Sokaogon Gaming Enter. Corp. v. Tushie–Montgomery Assocs., Inc.*, 86 F.3d 656 (7th Cir. 1996) (*valid* contract with arbitration clause agreed upon by both contractor and tribe constituted waiver of sovereign immunity for purposes enforcing arbitration). A waiver must be clear and unequivocal and must issue from a tribe's governing body, not from unapproved acts of tribal officials.

 [¶ 13.] Calvello further claims the Tribe's after-the-fact assertion of sovereign immunity came too late. Nothing in the law, however, supports such an argument. Like subject matter jurisdiction, tribal sovereign immunity can be raised at any time. *See generally Shortbull v. Looking Elk*, 677 F.2d 645, 650 (8th Cir.1982); *Ramey Const. Co., Inc.*, 673 F.2d at 318. *See also* SDCL 15–6–12(h)(3) ("*Whenever* it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.")(emphasis added). Additionally, it must be noted that Calvello is not attempting to enforce the arbitrator's award in this suit. Although it may be said he is seeking relief similar to what the arbitrator awarded, it is clear Calvello is now bringing a wholly separate action. How, then, can a supposed waiver based on an agreement to arbitrate also act as a waiver for a separate lawsuit? Even if there was an agreement on arbitration, for purposes of sovereign immunity, consent to arbitrate is not consent to a lawsuit. *Pan American Co. v. Sycuan Band of Mission Indians*, 884 F.2d 416, 418–19 (9th Cir.1989)(finding waiver on basis of an arbitration clause would be impermissible because it would be finding consent by implication); *cf. Val–U Constr. Co.*, 50 F.3d at 563 (concluding that entering *valid* arbitration agreement was a waiver of immunity with respect to suit to enforce arbitration). Accordingly, we find no waiver of the Tribe's sovereign immunity in the tribal attorney's unauthorized participation in arbitration proceedings.

3. "Indian lands" are defined as:
 [A]ll lands within the limits of any Indian reservation; and ... any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held

### 3. IGRA and the Tribal–State Gaming Compact

[¶ 14.] In 1988, Congress enacted the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721 ("IGRA" or "Act"), governing the operation of gaming on Indian land.[3] By this Act, Congress "expressly preempt[ed] the field in the governance of gaming activities on Indian lands." S.Rep. No. 100–446, at 6 (1988), *reprinted in* 1988 USCCAN 3071, 3076; *see also Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536 (8th Cir. 1996) (IGRA completely preempts the field of Indian gaming as against state law). In enacting IGRA, Congress specifically found that "a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government...." 25 U.S.C. § 2701(4); *see also* 25 U.S.C. § 2702(1).

 [¶ 15.] IGRA permits some state regulation of certain tribal gaming activities as specifically authorized by the Act, but it was not intended to expand state authority on Indian lands. S.Rep. No. 100–446, at 5, *reprinted in* 1988 USCCAN 3071, 3075; *Oneida Tribe of Indians of Wisconsin v. Wisconsin*, 951 F.2d 757, 759 (7th Cir.1991). One of the stated policies of IGRA is "to assure that gaming is conducted fairly and honestly by both the operator and players ... and to protect such gaming as a means of generating tribal revenue." 25 U.S.C. § 2702(2) and (3). Congress concluded that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." 25 U.S.C. § 2701(5). The Act installs

a framework for the regulation of gaming activities on Indian lands which provides that in the exercise of its sovereign rights,

by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.
25 U.S.C. § 2703(4).

unless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands, the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities.... In no instance, does [the Act] contemplate the extension of State jurisdiction or the application of State laws for any other purpose.

S.Rep. No. 100–446, at 5–6 (1988), *reprinted in* 1988 USCCAN 3071, 3075–76. Thus, tribal sovereignty remains intact under IGRA unless the tribe affirmatively elects to have state law and jurisdiction extend to tribal land. S.Rep. No. 100–446, at 5. Tribes may elect to be subject to state jurisdiction pursuant to Tribal–State compacts negotiated for the purpose of gaming on Indian land. *See* 25 U.S.C. § 2710(d)(3)(C)(i).

[¶ 16.] In summary, nothing in IGRA itself abrogates immunity for the purpose of allowing private civil suits against Indian tribes. *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Florida,* 63 F.3d 1030, 1048 (11thCir.1995)(doctrine of sovereign immunity bars management company's claim for breach of contract against tribe).[4] The Act effects only a limited waiver of a tribe's sovereign immunity as it relates to *enforcement* of IGRA's provisions. *Maxam v. Lower Sioux Indian Community,* 829

F.Supp. 277, 281–82 (D.Minn.1993); *Ross v. Flandreau Santee Sioux Tribe,* 809 F.Supp. 738, 745 (D.S.D.1992). The question, then, is whether the Tribe waived immunity in its Gaming Compact with the State of South Dakota.[5] The Compact must be analyzed under the principle that provisions of treaties and statutes dealing with Indian tribes should be liberally interpreted in their favor. *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 582, 8 L.Ed. 483 (1832) (M'Lean, J., concurring); *Winters v. United States,* 207 U.S. 564, 576–77, 28 S.Ct. 207, 211–12, 52 L.Ed. 340 (1908). "The policy of leaving Indians free from state jurisdiction and control is deeply rooted in [our] Nation's history." *Rice v. Olson,* 324 U.S. 786, 789, 65 S.Ct. 989, 991, 89 L.Ed. 1367 (1945). In determining contractual intent, we are bound by the plain and ordinary meaning of the words used. *Land & Marine Dev., Inc. v. Widvey,* 1996 SD 44, ¶ 7, 546 N.W.2d 380, 382; *American State Bank v. Adkins,* 458 N.W.2d 807, 809 (S.D.1990).

[¶ 17.] The Yankton Sioux Tribe, after extensive negotiations with the State of South Dakota, entered into a Gaming Compact on April 29, 1991. The Compact sets forth the obligations and restrictions in bringing about the anticipated economic benefits to the Tribe, while attempting to pre-

---

4. A majority of courts conclude that IGRA waives tribal sovereign immunity in instances where compliance with IGRA is at issue and where only declaratory or injunctive relief is sought. See *Montgomery v. Flandreau Santee Sioux Tribe,* 905 F.Supp. 740, 745 (D.S.D.1995) ("The Court has subject matter jurisdiction to consider whether defendants [tribes] have complied with [IGRA]."); *Calvello,* 899 F.Supp. at 438 ("[F]ederal courts may find a waiver of tribal sovereign immunity for the purpose of enforcing the provisions of the IGRA where prospective injunctive relief, and not monetary relief, is sought."); *Maxam,* 829 F.Supp. at 281 (holding that, by engaging in gaming, tribe waives sovereign immunity for narrow purpose of determining compliance with IGRA); *Ross,* 809 F.Supp. at 745 ("Engaging in gaming pursuant to the IGRA constitutes an express waiver of sovereign immunity on the issue of compliance with the IGRA."); *Cohen,* 543 N.W.2d at 380 ("LSI's operation of a gaming hall subjects it to a non-tribal court's authority to enforce compliance with the IGRA, not claims for money damages."). *But see Davids v. Coyhis,* 869 F.Supp. 1401, 1408–09 (E.D.Wis.1994) (rejecting the reasoning of *Ross* and *Maxam* ).

5. The United States District Court ruled that the Tribe "did waive its immunity for the purposes of this suit when it agreed to a limited waiver of its sovereign immunity in the 1991 gaming compact with the State of South Dakota." Calvello argues that this ruling is res judicata. We think it is dicta. That case was dismissed for lack of federal subject matter jurisdiction. "[I]n the absence of subject matter jurisdiction there can be no preclusive findings or conclusions on the merits, and dismissal for lack of jurisdiction is without prejudice." *Aerolineas Argentinas, v. United States,* 77 F.3d 1564, 1572 (Fed.Cir.1996). Indeed, both the federal district court and the Eighth Circuit Court of Appeals dismissed without prejudice to the state court action. A dismissal for lack of subject matter jurisdiction is never routinely considered an adjudication on the merits. Fed.R.Civ.P. 41(b). At best such dismissal operates as res judicata where the parties have had a full and fair opportunity to litigate the jurisdictional issue. *American Surety Co. v. Baldwin,* 287 U.S. 156, 166, 53 S.Ct. 98, 101–02, 77 L.Ed. 231 (1932); *Angel v. Bullington,* 330 U.S. 183, 192, 67 S.Ct. 657, 662, 91 L.Ed. 832 (1947).

serve the integrity of the gaming industry in South Dakota. Under IGRA, any Tribal–State Compact may include provisions relating to

(i) the application of the criminal and civil law and regulations of the Indian tribe or the State that are *directly related to, and necessary for, the licensing and regulation of such activity;*

(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe *necessary for the enforcement of such laws and regulations;*

\* \* \* \* \* \*

(v) remedies for breach of contract;

\* \* \* \* \* \*

(vii) any other subjects that are directly related to the operation of gaming activities.

25 U.S.C. § 2710(d)(3)(C)(emphasis added).

[¶ 18.] We find nothing in the Gaming Compact of 1991 or the Amended Compact of 1993 that deals directly with private party claims for breach of contract against the Tribe. Section 6 of both versions of the Compact provides:

Cases involving only tribal members shall be heard in tribal court. Cases involving one or more persons who are not tribal members shall be heard in state court, unless all parties stipulate that the action shall be heard in tribal court.

It is understood by the parties that the provisions of this paragraph are *limited to civil cases arising from transactions related to or arising from, gaming conducted pursuant to this Compact. This provision shall not be construed to be a waiver of the sovereign immunity of the Tribe.*

(emphasis added). These contrasting demarcations may at first seem antagonistic, but on close examination, we see that one merely allocates jurisdiction in disputes between "persons" and the other only affirms the Tribe's intent to keep so much of its immunity in gaming matters as is permissible under IGRA. From the specific language of Section 6, it is obvious the drafters of the Compact never intended an unlimited waiver of sovereign immunity. Hence the sentence: "This

provision shall not be construed to be a waiver of the sovereign immunity of the Tribe." As if to underscore it, that intent is restated at the end of the agreement in Paragraph 13.8: "This Compact shall not be construed to waive or diminish the sovereignty of the Tribe or the State of South Dakota, except as specifically provided by the terms of the Compact set forth above." Moreover, the term "persons" as used Section 6 hardly suggests the Tribe is subjecting itself to state jurisdiction. The word "person" rarely describes a sovereign government. *See Brink Elec. Const. Co. v. South Dakota Dep't of Revenue,* 472 N.W.2d 493, 496 (S.D.1991) (citing *Southern Union Gas Co. v. New Mexico Pub. Serv. Com'n,* 82 N.M. 405, 482 P.2d 913 (N.M.1971), *overruled on other grounds by De Vargas Sav. and Loan Ass'n v. Campbell,* 87 N.M. 469, 535 P.2d 1320 (1975)).

[¶ 19.] Consequently, we decline to read the provisions of Section 6 to broadly situate within state court jurisdiction all civil disputes between the Tribe and non-tribal persons however tangentially those disputes might relate to gaming. A fair reading of the Compact indicates a limited waiver of tribal immunity, with an understanding that certain disputes between "persons" will be heard in either tribal or state court. A gaming dispute between a non-tribal member and a management contractor might be an example of a case cognizable in state court. This case, on the other hand, is a private dispute over compensation between the Tribe and one of its former employees. Generally, suits to recover debts Indian tribes purportedly owe are subject to the defense of sovereign immunity. *Bottomly v. Passamaquoddy Tribe,* 599 F.2d 1061, 1064 (1st Cir.1979); *Ramey Constr. Co., Inc.,* 673 F.2d at 319; *Wells v. Philbrick,* 486 F.Supp. 807, 809 (D.S.D.1980).

[¶ 20.] Although Indian tribes are permitted under IGRA to enter into management contracts for their gaming operations, we find nothing in the Act that places tribal-management disputes under state court jurisdiction. *See* 25 U.S.C. § 2711(a)(1); *see also* 25 U.S.C. § 2711(c)(1) (permitting the Gaming Commission to approve management contracts providing for a fee based upon a

percentage of the net revenues of a tribal gaming activity).

IGRA and its regulations further prescribe essential terms which must be contained in a management contract before the same can be "approved" by the NIGC's Chairman (or the Secretary of the Interior for contracts, like the present, which were submitted prior to NIGC organization). 25 U.S.C. § 2711(b)(1-6); 25 C.F.R. Part 531.1(a-n). Along with the presence of an adequate tribal ordinance regarding gaming and satisfactory background checks for individuals and entities representing management parties, 25 U.S.C. § 2711(a), the presence of the various essential contract terms is critical regarding federal approval of management contracts.

*Bruce H. Lien Co. v. Three Affiliated Tribes,* 93 F.3d 1412, 1417–18 (8th Cir.1996) (footnotes omitted).

■■■ [¶ 21.] Neither IGRA nor its implementing regulations provide a specific method for resolving disputes between a tribe and a management contractor. *See* 25 C.F.R. § 522.2(f) (requiring tribes to enact ordinances providing for procedures for resolving disputes between "the gaming public and the tribe or the management contractor.") The regulations do require management contracts to include provisions for resolving such disputes (25 C.F.R. § 531.1(a), (k)), but Calvello's contract with its arbitration clause was never approved by the Tribe's General Council or the Chair of the Indian Gaming Commission or the Secretary of the Interior, pursuant to 25 U.S.C. § 2711. Therefore, it was "null and void" as the arbitrator and the federal district court both concluded. *See Calvello,* 899 F.Supp. at 436.

■■■ [¶ 22.] The Tribe's limited waiver of sovereign immunity will not authorize Calvello's lawsuit in circuit court. If Calvello has a remedy against the Tribe, he must seek it in tribal court.[6] In matters involving commercial relations, it has long been ac-

knowledged that "subject[ing] a dispute arising on a reservation ... to a forum other than the one they have established for themselves," may "undermine the authority of the tribal cour[t] ... and hence ... infringe on the right of the Indians to govern themselves." *Santa Clara Pueblo,* 436 U.S. at 59, 98 S.Ct. at 1677 (quoting *Fisher v. District Court,* 424 U.S. 382, 387–88, 96 S.Ct. 943, 947, 47 L.Ed.2d 106 (1976) and *Williams v. Lee,* 358 U.S. 217, 223, 79 S.Ct. 269, 272, 3 L.Ed.2d 251 (1959)); *see also National Farmers Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 855–57, 105 S.Ct. 2447, 2453–54, 85 L.Ed.2d 818 (1985) ("Our cases have often recognized that Congress is committed to a policy of supporting tribal self-government and self-determination."); *Bowen v. Doyle,* 880 F.Supp. 99, 123 (W.D.N.Y.1995) (even if state court has jurisdiction and matter is not currently pending before tribal court, state courts must abstain from hearing suits arising on reservations until after tribal courts have resolved the issue); *Smith v. Babbitt,* 875 F.Supp. 1353, 1366–67 (D.Minn.1995) (non-tribal court must abstain from hearing matter arising on Indian land until plaintiff has exhausted remedies in tribal court). Further, in accord with the long-standing policy of encouraging tribal self-government, Indian tribes must maintain the power to make their own substantive law on internal matters and to enforce that law in their own forums. *United States v. Quiver,* 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1196 (1916); *Williams,* 358 U.S. at 223, 79 S.Ct. at 272; *see also United States v. Wheeler,* 435 U.S. 313, 332, 98 S.Ct. 1079, 1090, 55 L.Ed.2d 303 (1978) ("Tribal courts are important mechanisms for protecting significant tribal interests."). A vital part of sovereignty encompasses tribal authority over activities of non-Indians conducted on Indian lands. *Montana v. United States,* 450 U.S. 544, 565–66, 101 S.Ct. 1245, 1258–59, 67 L.Ed.2d 493 (1981); *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134,

---

**6.** The Tribe may have consented to suit in the tribal court forum under 25 C.F.R. § 11.104(b)(requiring tribes with a CFR court to pass a resolution permitting the tribe to be sued in that court). We make this assumption because the Yankton Sioux Tribe is no longer listed under 25 C.F.R. § 11.100(a). See *Whiteco Metrocom v. Yankton Sioux Tribe,* 902 F.Supp. 199 (D.S.D.1995) (finding no proof of such resolution as of that date as the Tribe was still listed in § 11.100(a)).

152–53, 100 S.Ct. 2069, 2080–81, 65 L.Ed.2d 10 (1980).

> [C]ivil jurisdiction over the activities of non-Indians on reservations lands presumptively lies in tribal courts, unless affirmatively limited by a specific treaty provision or federal statute. *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 18, 107 S.Ct. 971, 977, 94 L.Ed.2d 10 (1987); *Duncan Energy v. Three Affiliated Tribes*, 27 F.3d 1294, 1299 (8th Cir.1994).

*Bruce H. Lien Company*, 93 F.3d at 1419 (tribal court to determine in first instance validity of gaming management agreement); *Dillon*, 144 F.3d at 584 (plaintiff may pursue claim in Yankton Sioux tribal court).

[¶ 23.] Our ruling today is a narrow one: We uphold summary judgment under the distinct state of the record in this case. By our decision, Calvello might not be deprived of his day in court, but only his day in the court of his choice. *Bank of Oklahoma v. Muscogee (Creek) Nation*, 972 F.2d 1166, 1169 (10th Cir.1992)(finding no due process violation in the placement of plaintiff's claim to tribal court); *see also Federico v. Capital Gaming Int'l Inc.*, 888 F.Supp. 354, 357 (D.R.I.1995) (plaintiff free to seek a remedy in tribal forum, if tribal law provides a remedy). Subject, of course, to the tribal court's determination, can jurisdiction there be any more fitting? Calvello contracted with the Tribe to manage a tribal business on tribal property to be paid in tribal funds.

[¶ 24.] Affirmed.

[¶ 25.] MILLER, C.J., and GILBERTSON, J., concur.

[¶ 26.] SABERS and AMUNDSON, JJ., dissent.

SABERS, Justice (dissenting).

[¶ 27.] **PARTICIPATION AND ACQUIESCENCE IN ARBITRATION BY TRIBE, THROUGH ITS CHAIRMAN, ATTORNEY, AND ACCOUNTANT,CONSTITUTED A WAIVER OF SOVEREIGN IMMUNITY.**

Indian tribes are "domestic dependent nations" that exercise inherent sovereign authority over their members and territories. *Cherokee Nation v. Georgia*, 5 Pet. 1, 17, 8 L.Ed. 25 (1831). Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978). *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112, 1119 (1991). Here, participation and acquiescence in arbitration constituted a "clear waiver" of Tribe's sovereign immunity.

[¶ 28.] Tribe waived any objections to arbitration by participating without objection. Tribe's Chairman and its accountant both testified, and Tribe apparently turned over financial records. Tribe contends that as soon as its General Council learned of the arbitration on September 27, 1993 (three days after it occurred), it passed a resolution that the tribal attorney was not authorized to participate in arbitration. The tribe further claims: "Following this instruction, the Tribal attorney withdrew from any further activity concerning the arbitration." Tribe's Br. at 8.

[¶ 29.] The accuracy of this latter claim is questionable in light of the arbitrator's note that Tribe's attorney contacted him sometime *after* October 26; Calvello filed a post-hearing brief on October 26, 1993. In its opinion, the arbitrator notes:

> Legal Counsel for the Employer, James Abourezk, had thirty business days in which to file a response brief to the Employee's brief if he deemed it appropriate. Mr. Abourezk advised the undersigned *shortly before the expiration date* that it was not necessary for the Employer to file a response brief as his closing statements at the arbitration hearing adequately covered the arguments raised in the Employee's post hearing brief, after which the record was considered closed.

(Emphasis added).

[¶ 30.] If Tribe attempted to "revoke" the agreement to arbitrate following arbitration hearing, it should have alerted the arbitrator and Calvello and then persisted in its position. There is nothing in the record to docu-

ment any notice to the arbitrator. In any event, once the arbitrator issued a decision, Tribe should have brought a motion to vacate. *See* 9 U.S.C. §§ 10, 12; *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1086 (2nd Cir.1993) ("The procedures established by 9 U.S.C. §§ 10 [grounds for vacating] and 12 [limitations period] are normally the exclusive remedy to challenge the results of an arbitration proceeding.").

[¶ 31.] Moreover, Tribe had an earlier option of refusing arbitration. If Tribe had exercised the option to refuse arbitration, Calvello could have brought a motion to compel arbitration. Tribe could have then sought a judicial determination whether arbitration could be compelled and whether there existed any arbitrable issues. *See Kansas City S. Transp. Co., Inc. v. Teamsters Local Union # 41*, 126 F.3d 1059, 1067 (8th Cir. 1997):

> [T]he Supreme Court set forth three rules governing a party's duty to arbitrate. First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Second, "the question of arbitrability—whether a collective bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination." Third, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims."

(Quoting *AT & T Tech., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)). Whether there is an agreement to arbitrate and whether an issue is arbitrable are subject to judicial determination *unless* the "matter has gone through arbitration and an award has been issued." Then, "the grounds on which a court asked to confirm (enforce) the award can refuse to do so are limited[.]" *Comprehensive Accounting Corp. v. Rudell*, 760 F.2d 138, 139–40 (7th Cir.1985).

[¶ 32.] Tribe could also have taken the initiative by seeking declaratory or injunctive relief prior to the commencement of arbitration. Additionally, Tribe could have, subject to its objection on sovereign immunity grounds, proceeded with arbitration, thus reserving its right to challenge the arbitrator's authority in a later judicial proceeding. *See International Ass'n of Machinists & Aerospace Workers, Lodge No. 1777 v. Fansteel, Inc.*, 900 F.2d 1005, 1009–10 (7th Cir.), *cert. denied*, 498 U.S. 851, 111 S.Ct. 143, 112 L.Ed.2d 109 (1990). Here, Tribe *never* asserted sovereign immunity as a bar to arbitration until Calvello sought entry of judgment in federal court, which was too late.

[¶ 33.] The case of *Val–U Construction Co. of South Dakota v. Rosebud Sioux Tribe*, 146 F.3d 573 (8th Cir.1998), reiterated that court's prior holding that an arbitration provision in a contract constituted a waiver of sovereign immunity.[7] Although distinguishable because the contract in that case had Council approval, part of that opinion could have been written for this case:

> [Trial] Judge Kornmann described the Tribe's course of conduct best in his opinion on this issue:

> [T]he Tribe, represented by counsel of their choosing, consciously and intentionally took a reckless and totally ill-conceived course without any substantial legal basis. The Tribe argues that the Eight Circuit decision in this case changed existing law. That argument is rejected. There was no Eighth Circuit case directly on point. While the Tribe obviously did not correctly anticipate the appellate ruling as to sovereign immunity, they had no way of knowing or even forecasting what that decision would ultimately be. There is no dispute that the Tribe had repeated notices from the arbitrator and a great deal of time to carefully decide what to do. * * * The extremely high risk strategy used by the Tribe and their attorneys (and it is important to note that the Tribe's present attorneys had no part in such decisions) was akin to being served with process in a lawsuit and ignoring the matter, hoping that an appellate court would ultimately

---

7. *See Rosebud Sioux Tribe v. Val–U Constr. Co. of South Dakota, Inc.*, 50 F.3d 560 (8th Cir.1995), *cert. denied*, 516 U.S. 819, 116 S.Ct. 78, 133 L.Ed.2d 37 (1995).

find lack of jurisdiction. This is inexcusable neglect.

*Val–U Const.*, 146 F.3d at 578. Likewise, here the Tribe acquiesced in arbitration by permitting its attorney to actively participate in arbitration and by failing to make sure he withdrew from further proceedings when Tribe purportedly "learned" of the arbitration.

[¶ 34.] Tribe's active participation, in the absence of objection, constitutes waiver of sovereign immunity. *Cf. Comprehensive Accounting*, 760 F.2d at 140:

> No one should be forced into arbitration without an opportunity to show that he never agreed to arbitrate the dispute that is the subject of the arbitration. The Rudells had that opportunity when they were notified of the arbitration, and they let it pass by. It was then too late for them to sit back and allow the arbitration to go forward, and only after it was all done, and enforcement was sought, say: oh by the way, we never agreed to the arbitration clause. That is a tactic that the law of arbitration, with its commitment to speed, will not tolerate.

*See also Fortune, Alsweet & Eldridge, Inc. v. Daniel*, 724 F.2d 1355, 1357 (9th Cir.1983) (confirming arbitration award over defendant's objection):

> We have long recognized a rule that a party may not submit a claim to arbitration and then challenge the authority of the arbitrator to act after receiving an unfavorable result.
>
> . . .
>
> Daniel's conduct demonstrated he agreed to submit this conflict to arbitration and waived any right to object.

*See Ficek v. Southern Pac. Co.*, 338 F.2d 655, 656–57 (9th Cir.1964), *cert. denied*, 380 U.S. 988, 85 S.Ct. 1362, 14 L.Ed.2d 280 (1965):

Even if the initial arbitration clause was not broad enough to include Ficek's claim, by voluntarily submitting the dispute to arbitration, Ficek and the railway evinced a subsequent agreement for private settlement which would cure any defect in the arbitration clause.

The rule is sometimes stated in terms of waiver: A claimant may not voluntarily submit his claim to arbitration, await the outcome, and, if the decision is unfavorable, then challenge the authority of the arbitrators to act.

Ficek's suggestion that the subject-matter "jurisdiction" of the arbitrators could not be enlarged by the conduct of the parties misapplies the analogy—the authority of the arbitrators, unlike that of a court, was rooted in the parties' consent.

(Citations omitted).

[¶ 35.] It further appears that Tribe's counterclaim [8] is barred by the doctrine of res judicata. It is clear from the arbitrator's opinion that he considered tribal financial records in arriving at the award for profits owed to Calvello. Tribe participated fully in arbitration; Tribe's accountant testified; both parties presented the joint exhibits upon which the arbitrator based the award. *See Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853, 860–61 (1st Cir.1997) ("[W]here a party had the full power to press its claim in the arbitration proceeding, the arbitration decision, therefore, stands as a res judicata bar to these claims.") (citations & internal quotations omitted).

[¶ 36.] Tribe waived sovereign immunity by participation and acquiescence in arbitration and it did not challenge arbitration in accordance with the Arbitration Act; therefore, we should reverse the order granting summary judgment to Tribe and remand for proceedings consistent with this dissent.[9]

8. Tribe alleges in its counterclaim that Calvello manipulated profit percentages in order to fraudulently increase his share of the profit, thereby converting tribal funds and breaching his fiduciary duty to Tribe.

9. This matter has dragged on for over four years. After the proceedings in the federal district and appellate courts, suit was brought in state court and presided over by two different circuit court judges. Tribe made four motions to dismiss and attempted to take a discretionary appeal on at least two occasions. Tribe petitioned for a writ of prohibition to this court, which we granted but quashed after oral argument. Tribe next made its motion for summary judgment, the subject of this appeal.

Under similar circumstances in *Bruce H. Lien Co. v. Three Affiliated Tribes*, 93 F.3d 1412, 1419

AMUNDSON, Justice (dissenting).

[¶ 37.] In this case, counsel for the Tribe *participated in the selection of the arbitrator,* appeared at the arbitration, submitted evidence and argument and later advised the arbitrator that no written brief would be submitted. Not until this case was in federal district court after the Tribe received an adverse decision from the arbitrator, was the trump card sovereign immunity brought forward. The majority holding in this case approves the withholding of this sovereign immunity bullet until you present your case and lose. Based on the authority cited in the majority writing, there was ample precedent on point for the Tribe and its attorney (who has represented the Tribe at every stage of this proceeding) to, in good faith, litigate this sovereign immunity issue right out of the chute. But now this Court seems to say if you lose in one forum where there was no personal jurisdiction—don't worry, you can always get a second bite of the apple here. I cannot agree with such a holding. I must conclude by stating that I am in total agreement with the dissent filed by Justice Sabers.

(8th Cir.1996), the Eighth Circuit Court of Appeals commented:

> So here we are. These parties, initially associated for the purposes of mutual profit and well being, are now fighting it out on three fronts (tribal court, federal court, and the NIGC [National Indian Gaming Commission]) over a number of issues, with perceptively little hope of a quick or inexpensive resolution. Two courts have this dispute on active status; the NIGC continues its review and continues in its attempt to bring the contract and gaming operation into compliance with IGRA [Indian Gaming Regulatory Act]; arbitrators, once chosen, presumably await notification that their activity is to resume. The vessel which is the orderly administration of justice is leaking all over and making a big mess.
>
> In this case, the leak should stop here.