In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-1718

SYSCO INDIANAPOLIS LLC,

*Plaintiff-Appellee,*

*v.*

TEAMSTERS LOCAL 135,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:22-cv-00131 — **James P. Hanlon**, *Judge.*

———————————

ARGUED MAY 28, 2024 — DECIDED AUGUST 20, 2024
AMENDED ON PETITION FOR REHEARING OCTOBER 31, 2024

———————————

Before JACKSON-AKIWUMI, LEE, and KOLAR, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* When John Smith did not receive his expected monthly benefit check from his employer, his labor union filed a grievance on his behalf. His employer, Sysco Indianapolis, LLC, went through the first steps of the grievance process with the labor union, Teamsters Local 135. But Sysco balked at the last step—arbitration—

because it decided Smith's grievance was not arbitrable under the parties' collective bargaining agreement. Sysco pulled out of the grievance process altogether and sought a declaratory judgment from the district court. The Union counterclaimed, seeking its own declaratory judgment.

The district court sided with Sysco: it found that the monthly benefit was governed by terms outside the bargaining agreement and that the parties' bargaining history showed they did not intend for the benefit to be arbitrable. We reach a different conclusion after our de novo review. Because Sysco failed to present the "most forceful evidence," *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 585 (1960), showing that the parties intended to exclude the monthly benefit from the arbitration provision in the collective bargaining agreement, we reverse.

**I**

Sysco Indianapolis, LLC, is a food service warehouse and transportation facility in Indianapolis, Indiana. Teamsters Local 135 represents certain employees of Sysco for the purpose of collective bargaining. On January 8, 2019, the Union filed a grievance alleging that Sysco was violating the parties' 2018 collective bargaining agreement (CBA) by not providing a Supplemental Early Retirement Benefit (SERB) of $500 per month to certain qualified retirees and current employees.

When a disagreement of this sort arises, the CBA obligates the parties to resolve the dispute through a grievance process culminating, if necessary, in arbitration. The CBA's grievance procedure clause defines a grievance as "any controversy, complaint or dispute arising as to the interpretation or application of or the compliance with any provisions on this

Agreement." The clause then outlines a five-step process the parties must take before the grievance can be heard by an arbitrator.[1]

The Union initiated the five-step process by filing a grievance "on behalf [of] John Smith and all future retirees." The grievance stated that Smith is "entitled to an additional 500 a month until age 65. He is currently not receiving this money. Make whole in all ways." The grievance cited Article 18 of the CBA and "all that may apply" as the contract provision violated. Article 18 provides:

> The previous labor agreement terminated participation by the Employer and the Union in the

---

[1] At step one of the process, the aggrieved employee must discuss the grievance with an immediate supervisor within ten workdays of the event that gave rise to the grievance, and the supervisor must give a verbal reply within ten workdays of the discussion. If the grievance is not resolved, the parties move to the next step. Step two requires the employee to put the grievance into writing and present it to the supervisor within five workdays of receiving a response in step one. The supervisor, employee, and union representative must then meet to try to resolve the grievance. The supervisor must issue a written answer to the representative within ten workdays of the meeting. If not resolved, the grievance moves to step three, where the business agent appeals the grievance in writing to the branch manager within ten days of the representative's receipt of an answer in step two. The branch manager and business agent must meet, and within ten workdays of that meeting, the branch manager must issue a written decision. If the grievance is still not resolved, it moves to step four: consideration by the Joint Grievance Committee, which consists of an equal number of representatives from Sysco and the Union. Once the Joint Grievance Committee has resolved the grievance, the losing party has ten calendar days to appeal. But if the Joint Grievance Committee is unable to reach a conclusion within ten workdays, the parties can proceed to step five: arbitration.

Central States, Southeast and Southwest Areas Pension Fund. Accordingly, the Employer is no longer obligated to contribute to or participate in said Fund.

All regular full time employees covered by this Agreement hired before 5/15/2018 shall be eligible for enrollment in the Sysco Corporation Retirement Plan and the Sysco Corporation Employees' 401(k) Plan, subject to all rights, terms and conditions of this Plan including any and all additions, deletions or modifications made to any and all terms, conditions and benefits of this Plan made during the term of this Agreement.

All regular full time employees hired after 5/15/2018 shall be eligible for the Sysco Enhanced 401(k) program under the same terms and conditions as non-union employees at the Company.

This was the second time the Union filed a grievance about the $500 monthly benefit. The first was in November 2013. That time, the Union submitted a similar grievance claiming a violation of the same provision of the 2013 CBA. That grievance went through the first four steps of the grievance process and resulted in the Joint Grievance Committee issuing a final and binding decision in the Union's favor. After Sysco refused to comply with the Joint Grievance Committee's decision, the Union sued Sysco in federal district court to enforce the decision. That litigation ended with a 2018 judgment in the Union's favor ordering Sysco to pay the monthly SERB under the parties' 2013 CBA.

The district court had not issued its ruling on the 2013 grievance when the parties started negotiating the 2018 CBA. But the Union believed that, because the Joint Committee had already decided in its favor and the relevant contract language in the 2013 CBA and 2018 CBA was largely the same, the $500 monthly benefit would carry forward into the 2018 CBA.[2] Sysco had other plans.

After going through the first four steps of the grievance process to resolve Smith's January 2019 grievance, Sysco changed course. Rather than proceed to step five, which is arbitration, Sysco asked the district court in January 2022 to declare that the grievance was not substantively arbitrable. The Union answered Sysco's complaint and filed a two-count counterclaim seeking a declaration that the grievance was arbitrable and injunctive relief to compel arbitration. Sysco filed a motion to dismiss the Union's counterclaims. Shortly thereafter, both parties moved for summary judgment.

The district court agreed with Sysco that the 2019 grievance was not substantively arbitrable.[3] The court first found that the 2018 CBA's arbitration clause was "broad," which creates a presumption of arbitrability. The only way

---

[2] The parties made only two changes to Article 18 between the 2013 CBA and the 2018 CBA: they changed the article's title from "Pensions" to "Retirement," and they limited participation in the Retirement Plan and 401(k) Plan to employees hired before May 15, 2018.

[3] The district court declined to reach Sysco's additional argument that the Union did not have standing to compel arbitration on behalf of retirees. We find the Union has standing as it brought the grievance on behalf of John Smith, a retiree who consented, and future retirees, who are current employees. *See Exelon Generation Co., LLC v. Loc. 15, Int'l Bhd. of Elec. Workers*, 540 F.3d 640, 649 (7th Cir. 2008).

Sysco could overcome that presumption, the court explained, was by "produc[ing] 'most forceful evidence of a purpose to exclude the claim from arbitration.'" The court found that Sysco did so by showing that (1) the SERB was not incorporated into the CBA itself, (2) the parties' bargaining history demonstrates that they had considered and rejected including language about the SERB into Article 18 of the CBA, and (3) the CBA and the document outlining the SERB are entirely separate documents. The court acknowledged that the grievance identified Article 18 as the provision being violated but reasoned that "the language of the CBA—not the language of the grievance—determines whether a grievance is subject to arbitration." And here, the court found, the CBA did not contemplate arbitration for disputes about the SERB. As a result, the court granted Sysco's motion for summary judgment and denied the Union's. The Union appeals this decision, which we review de novo. *Int'l Bhd. of Elec. Workers Loc. 2150 v. NextEra Energy Point Beach, LLC*, 762 F.3d 592, 593 (7th Cir. 2014).

## II

For nearly a century, the Supreme Court has interpreted our national labor laws as reflecting a "congressional policy in favor of the enforcement of agreements to arbitrate grievance disputes." *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 458–59 (1957). To effectuate Congress's policy goal, the Court developed "a meaningful body of law to govern the interpretation and enforcement of collective bargaining agreements." *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 567 (1960). That body of law originates in a group of cases that have come to be known as the *Steelworkers*

*Trilogy. See id.*; *Warrior & Gulf*, 363 U.S. 574; *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593 (1960).

The *Steelworkers Trilogy* birthed four "principles" that guide our resolution of arbitration disputes. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). "The first principle gleaned from the *Trilogy* is that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Id*. (quoting *Warrior & Gulf*, 363 U.S. at 582). This means that, before we can compel arbitration, we must first "determine whether [the parties have] agreed to arbitrate th[e] particular dispute, for a duty to arbitrate can arise only by agreement." *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. TriMas Corp.*, 531 F.3d 531, 535 (7th Cir. 2008).

The second principle is that "the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Techs.*, 475 U.S. at 649; *see also John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 546–47 (1964).

The third principle follows from the first two: "in deciding whether the parties have agreed to submit a particular grievance to arbitration, [we are] not to rule on the potential merits of the underlying claims." *AT&T Techs.*, 475 U.S. at 649. This means we do not "weigh[] the merits of the grievance, consider[] whether there is equity in a particular claim, or determin[e] whether there is particular language in the written instrument which will support the claim." *Am. Mfg. Co.*, 363 U.S. at 568.

The fourth principle derived from the *Steelworkers Trilogy* is that our national labor laws establish a "presumption of

arbitrability." *AT&T Techs.*, 475 U.S. at 650. Under this presumption, "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Warrior & Gulf*, 363 U.S. at 582–83. Where doubts exist about whether a grievance is arbitrable under the terms of the agreement, those "[d]oubts should be resolved in favor of coverage." *Id.* at 583.

These principles are not elements of a claim, but background that informs our resolution of arbitration disputes. From these principles, our court has developed several considerations relevant to determining whether a claim should go to arbitration, including whether the parties' agreement explicitly contemplates (or prohibits) arbitrating a grievance, and whether other indicators of the parties' intent resolve the question. These considerations, to which we turn next, compel a finding of arbitrability in this case.

### A. Facial Arbitrability

When deciding whether a dispute is arbitrable, our first task is to determine "whether the Union is making a claim that is, 'on its face,' governed by the [collective bargaining agreement]." *TriMas*, 531 F.3d at 536 (quoting *Am. Mfg. Co.*, 363 U.S. at 568). To do so we look to (1) the language of the CBA's grievance and arbitration clause, and (2) the language of the grievance itself. *See Int'l Ass'n of Machinists & Aerospace Workers, Lodge No. 1777 v. Fansteel, Inc.*, 900 F.2d 1005, 1010 (7th Cir. 1990); *NextEra Energy Point Beach, LLC*, 762 F.3d 592, 594–95. Facial arbitrability is met here.

Article 9 of the 2018 CBA outlines the grievance and arbitration procedures. It defines a grievance as "any controversy,

complaint, or dispute arising as to the interpretation or application of or the compliance with any provisions on this Agreement." It then outlines a series of steps that an aggrieved party must take to get the benefit of arbitration, starting with discussing the grievance with a supervisor. Notably, the CBA does not exclude "any category of disputes from the reach of the arbitration clause." *TriMas*, 531 F.3d at 537. "[T]his language is of [the] type that we have referred to, in the past, as broad enough to trigger the presumption of arbitrability." *NextEra Energy Point Beach*, 762 F.3d at 594. That means we will enforce the parties' agreement to arbitrate unless Sysco can produce "the most forceful evidence of a purpose to exclude the claim from arbitration." *Warrior & Gulf*, 363 U.S. at 585.

Here, the grievance filed "on behalf [of] John Smith and all future retirees" complained that "John is entitled to an additional 500 a month until age 65. He is currently not receiving this money." In the portion of the grievance that asks for a "Contract Violation," Smith cited Article "18 and all that may apply." On its face, then, Smith's grievance simply requires an arbitrator or adjudicator to decide whether Article 18 requires that Smith be paid an additional $500 per month. The grievance does not mention the words "Supplemental Early Retirement Benefit" or refer to the external Retirement Plan that establishes that benefit. Smith's grievance is about the scope of Article 18. In that way, it presents a "dispute [] as to the interpretation or application of or compliance with" a provision of the CBA, which the parties agreed would be resolved through arbitration.

**B.  The "Most Forceful Evidence"**

Failing to identify any portion of the CBA explicitly exempting the $500 monthly benefit from the grievance and arbitration process, Sysco argues that it has produced, to use the Supreme Court's language, "the most forceful evidence of a purpose to exclude the claim from arbitration." *Warrior & Gulf,* 363 U.S. at 585. The case proving its point, according to Sysco, is *Printing Specialties & Paper Products Union Local 680 v. Nabisco Brands, Inc.*, 833 F.2d 102 (7th Cir. 1987). In that case, we held that a pension plan's "independence from the collective bargaining agreement, the bargaining history of the parties, and the lack of Pension Plan terms in the collective bargaining agreement" supported excluding grievances over pension benefits from arbitration, even though no express exclusion appeared on the face of the CBA. *Nabisco*, 833 F.2d at 104. Sysco contends that those same indicators of intent exist in this case, so the same outcome should result. Not so.

As a threshold matter, this case differs from *Nabisco* in an important way: The union in *Nabisco* claimed that it was entitled to early retirement benefits under the terms of the Pension Plan. *Id.* at 103. And the collective bargaining agreement in that case included only a "passing reference" to the Pension Plan. *Id.* at 103. The agreement said, "The Company agrees to continue its present Pension Plan in full force and effect for the term of the agreement." *Id*.

In this case, by contrast, Smith's grievance does not claim an entitlement under the terms of the Retirement Plan—it does not even reference the Retirement Plan. The Union maintains that it is Article 18 of the CBA and the parties' collective bargaining negotiations (as discussed below)—not the terms of the Retirement Plan—that obligate Sysco to pay the

additional $500 per month. *See Karl Schmidt Unisia, Inc. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW Loc. 2357*, 628 F.3d 909, 914 (7th Cir. 2010) (explaining that it is the union's understanding of their grievance claim, not the Company's characterization of it, that guides our consideration of whether the claim is arbitrable). That is a different question than the one we considered in *Nabisco*.

But even if we overlooked that difference and applied the indicators that the *Nabisco* court concluded collectively amounted to "most forceful evidence," *Warrior & Gulf*, 363 U.S. at 585, we would still reach a different result in this case because the parties' bargaining history is not as straightforward as Sysco suggests, thereby distinguishing the facts of this case from *Nabisco*.

Let's start with what Sysco gets right. We agree that the CBA does not incorporate the Retirement Plan and that the Retirement Plan is separate and independent of the CBA—two indicators the *Nabisco* court highlighted as evidence of the parties' intent to exclude pension benefits grievances from arbitration. Here, although Article 18 references "all rights, terms and conditions of th[e] Plan" and includes "any and all additions, deletions or modifications made to any and all terms, conditions and benefits of th[e] Plan," that language does not amount to an incorporation of the terms of the Retirement Plan. Sysco is also correct that, as with the pension plan in *Nabisco*, the Retirement Plan here existed before and apart from the parties' CBA. *Nabisco*, 833 F.2d at 105. The Plan was created in 1973 and contains its own rules for determining eligibility for benefits.

These two indicators point in Sysco's favor, but they are not—alone or together—sufficient to prove that the parties

intended to exclude Smith's grievance from arbitration. Those indicators show only that the Retirement Plan was not part of the 2018 CBA; they do not show that the parties meant to exclude the $500 benefit under the language of the CBA itself–which is what the grievance alleges.

Sysco believes that the third indicator the *Nabisco* court relied on—the parties' bargaining history—puts it over the top because that history "clearly demonstrates" the parties did not plan to arbitrate disputes related to the $500 monthly benefit. But we do not find the bargaining history to be so clear.

That history shows, Sysco points out, that the Union sought to include language in the 2018 CBA that would have more explicitly incorporated the $500 per month commitment. Yet that language did not end up in the final agreement. Sysco says that we should read that sequence of events as evidence that the parties explicitly rejected such an inclusion, and the CBA, therefore, does not guarantee the $500 monthly benefit. The Union concedes that the language it sought to include with respect to the benefit did not make it into the final agreement, but says that is not because Sysco refused. To the contrary, the Union recounts, the parties understood the 2018 CBA was to be governed by however the previous grievance under the 2013 CBA was resolved, whenever the court got around to resolving that older grievance. Thus, in the Union's view, unlike in *Nabisco*, the entitlement to the $500 monthly benefit stems directly from the CBA, not from the Pension Plan.

To support its argument, the Union points us to notes prepared by Sysco's negotiator, Scott Richardson, during the parties' negotiations over the 2018 CBA. Those notes, which Sysco's counsel confirmed at oral argument were written by

Richardson, reflect the Union's proposed changes to the agreement. In the portion of the document concerning Article 18, the Union proposed to "Reinstate the agreed to, in 2013, extra five hundred dollars ($500) in addition." Sysco's Richardson annotated the document with "not neg something [in] litigation bound by decision." (Richardson later submitted a declaration explaining that Sysco "would not negotiate benefits currently in litigation but [] would certainly comply with—or be bound by—the decision of the Court with regard to litigation related to the SERB and the 2013 to 2018 CBA.") The Union says these notes show Sysco agreed to "follow the outcome of the litigation," not that it "refuse[d] to pay the benefit" once the 2018 CBA took effect.

In response, Sysco says the notes show only that they agreed to be bound by any court decision to provide the monthly benefit under the 2013 CBA, but not the 2018 CBA. Sysco, however, points to no evidence in the record showing that was the parties' *shared* understanding. And while Richardson's notes could be read the way Sysco reads them, it is also quite reasonable to read them as the Union does. At the end of the day, it is not our job to speculate about what Sysco conveyed or meant to convey during negotiations. It is Sysco's responsibility to dispel any doubt by marshalling "the most forceful evidence of a purpose to exclude" the grievance from arbitration. *Warrior & Gulf*, 363 U.S. at 585. Sysco has not done so.

### C. One Final Consideration: Zipper Clauses

While the indicators the *Nabisco* court considered are helpful in assessing whether the parties intended to arbitrate a grievance alleging a violation of some extrinsic plan (as in *Nabisco*), those indicators are neither exhaustive nor generally

applicable to all cases involving questions of arbitrability.[4] Our analysis in arbitration cases must be driven, in the first instance, by the principles established in the *Steelworkers Trilogy*. And the *Steelworkers Trilogy* teaches that arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Warrior & Gulf*, 363 U.S. at 582–83; *see also TriMas*, 531 F.3d at 536. One final consideration deprives us of that positive assurance in this case.

The Union, which has no affirmative obligation to prove that the dispute was not excluded from arbitration, argues that the CBA's lack of a zipper clause supports sending the grievance to an arbitrator. As the Union sees it, a zipper clause would have "limit[ed] [the CBA's] provisions to those expressly set forth therein." Such language would effectively foreclose any debate about the parties' unwritten understandings by confining our review only to the words included in the agreement. But because the 2018 CBA lacks a zipper clause and because the evidence of the parties' intent is contested (as outlined above), the Union believes the arbitrator

---

[4] We have chosen to call them "indicators" here because they are largely derivative of the factual circumstances before the court in *Nabisco*. Cases with different facts might require different considerations (or offer different "indicators") altogether. That is true as a general matter in our cases, but even more so in arbitration cases because of the fact-intensive nature of the question presented. In each case we look to the language of the arbitration clause at issue and compare it to the language of the disputed grievance. We must be vigilant, then, not to let the factual circumstances (or indicators) in one case control the arbitrability analysis in another.

gets to decide what the parties agreed to. We find this argument persuasive.

A zipper clause "state[s] that the parties have had the opportunity to bargain over all mandatory subjects of bargaining and that they waive their right to bargain over such matters during the term of the agreement." *In re Twinbrook OpCo, LLC,* No. 06–CA–283709, 2023 WL 9020490, at *2 n.4 (N.L.R.B. Dec. 28, 2023). We have explained that zipper clauses prevent grievances based on "unwritten promises." *Yates v. City of Chi.*, 58 F.4th 907, 910 (7th Cir. 2023).

The lack of a zipper clause in this case makes the Union's argument that Sysco "promised and agreed to pay the [SERB] in an effort to convince the employees to withdraw from Central States and enroll in its pension plan," and that "no changes were made in the 2018 Agreement to the [SERB]" more plausible. We note this argument here not to comment on the merits of the Union's claim—that is decidedly not our province—but instead to demonstrate once more how, based on the disputed evidence bearing on the question of arbitrability, we cannot conclude that Sysco has presented "the most forceful evidence of a purpose to exclude [a] claim from arbitration." *Warrior & Gulf*, 363 U.S. at 585.

### III

Because the Union's grievance falls within the scope of the arbitration clause on its face and because we cannot say "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," *id*. at 582–83, this grievance must be sent to arbitration. The judgment of the district court is **REVERSED**.